922 F.2d 60
 Edward CRESSWELL, Agriconsultants Incorporated, American
Growth Properties Management Company Ltd., Eric Appleton,
Befors Finance Ltd., John Bird, Nora Bird, Peter Burkhardt,
Peter Byk, John A.L. Chettoe, David E. Cope, Dennis R.
Dudeney, V.S. Dwivedi, Lars Feuk, Fletcher Investments Ltd.,
John H. Fletcher, Noel Fox, Stuart J. Gardiner, C.L. Gavzey,
F. George, Kenneth E.F. George, Verity Anne Gibbons, Robert
Grant, Polly Gregory, A.D. Harris, David G. Hart, John M.
Hawkins, Patricia Hawkins, Spencer Hayes, Hilary
Corporation, Inc., Anthony Hyde, Izrada, S.A., Gordon Walter
James, Joval Investments Ltd., Jad Kabban, Philip J. Knight,
Pierre Lamarche, Roger Landau, Andrew Lewis, Horace G.
Lovegrove, James J. Mather, Malcolm Milton, Gregoire
Mozdyniewicz, Collin David Parker, Pezco Overseas, Inc.,
John Pirie, Matthew H. Pridgeon, A. Remini, Julia A. Robin,
Roger Y. Robin, Claudine Seikaly, John B. Shaw, Robert W.
Shields, Sianplan Ltd., Reginald E. Silletto, Basilla L.W.
Abel Smith, David F. Smith, Alec Snobel, Geoffrey W.
Sutcliffe, R.L. Thomas, Mary C. Wallace, Jan Wallin,
Patricia Wilkinson, as Executrix, and Gord N. Wilson,
Plaintiffs-Appellants,
Damer Harrisson, S.A., Plaintiff.
v.
SULLIVAN & CROMWELL and Prudential-Bache Securities, Inc.,
Defendants-Appellees.
 No. 721, Docket 89-7914.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 29, 1990.
Final Briefs Submitted Feb. 7, 1990.
Decided Dec. 10, 1990.
 
 Richard B. Cooper, New York City (James M. Latimer, Cooper, Brown & Behrle, P.C., New York City, on the brief), for plaintiffs-appellants.
 Bernard W. Nussbaum, New York City (Kenneth B. Forrest, Jeffrey I. Lang, Wachtell, Lipton, Rosen & Katz, on the brief), for defendants-appellees.
 Before OAKES, Chief Judge, and KEARSE and FLETCHER*, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Plaintiffs Edward Cresswell, et al., appeal from a final judgment of the United States District Court for the Southern District of New York, Robert W. Sweet, Judge, 704 F.Supp. 392, principally (1) dismissing so much of their second amended complaint as charged defendant Sullivan & Cromwell ("S & C") with fraudulent nondisclosure during discovery in a prior action by plaintiffs against S & C's client, defendant Prudential-Bache Securities, Inc. ("Bache"), and (2) voiding agreements relating to plaintiffs' representation in the present action by their former attorney. The district court granted summary judgment dismissing the complaint against S & C on the ground that plaintiffs could not show justifiable reliance on the challenged nondisclosure; it barred plaintiffs' former attorney from representing them and receiving a contingent fee in the present action because he would be an essential witness at trial. On appeal, plaintiffs contend principally that summary judgment was inappropriate because the question of whether their reliance was justifiable raised a genuine issue of material fact; and they contend that the orders with regard to their former attorney should be set aside. For the reasons below, we vacate the judgment dismissing the claims against S & C and remand for further consideration by the district court.
 
 I. BACKGROUND
 
 2
 This case has its roots in Bache's 1981-1982 offering in Europe of certain financial instruments (the "Spreads") based on the price differential between two types of futures contracts. Many of the facts are undisputed.
 
 
 3
 In October 1982, this price differential widened beyond its historical norms and caused holders of the Spreads, who included the present plaintiffs, to liquidate them at a loss. In March 1983, plaintiffs and several others brought suit against Bache in the district court for the Southern District of New York ("Cresswell I "), alleging that Bache had engaged in materially false and misleading marketing practices in connection with the Spreads. Cresswell I was settled by the present plaintiffs and Bache in early 1985 for approximately $3 million, enabling each of these plaintiffs to recover some 46% of his losses. Two other groups settled with Bache in July 1986 and January 1987, recovering some 94% and 71% of their respective losses.
 
 
 4
 The present suit was commenced in April 1987 against both Bache and S & C, asserting principally that during discovery in Cresswell I, Bache and S & C had fraudulently failed to produce certain documents that, if disclosed, would have led to a substantially higher settlement recovery for the present plaintiffs. The documents related to stock exchange inquiries into Bache's marketing of the Spreads.
 
 
 5
 A. The New York Stock Exchange Investigation
 
 
 6
 In January 1983, Polly Gregory, an investor who had suffered losses when she liquidated her Spreads and who would later become a plaintiff in Cresswell I, wrote to the New York Stock Exchange ("NYSE" or "Exchange"), complaining that the information provided her by Bache with respect to the Spreads had been misleading. Gregory's letter was routed to Barbara Krupinski in NYSE's Division of Member Firm Regulatory Services ("Services Division"), which handled customer complaints about member firms. Krupinski forwarded a copy to William Goldenblum, a Paris-based Bache attorney. Goldenblum responded to Krupinski by letter dated March 28, 1983, stating that Gregory had signed, inter alia, a "risk disclosure statement" and that Bache's marketing pamphlets were not misleading.
 
 
 7
 Krupinski responded to Gregory by letter dated April 29, 1983, stating that the Exchange had been in contact with Bache concerning her complaint, and sent her a copy of the March 28 letter the Exchange had received from Goldenblum. Krupinski's letter advised Gregory that the "Exchange staff does not adjudicate monetary claims or pass upon the merits of them," and suggested that Gregory might wish to consider requesting arbitration. The letter concluded as follows:
 
 
 8
 As part of our regulatory responsibilities, the staff of he [sic ] Exchange examines all customer complaints to determine whether a firm or its representatives committed any violations of Exchange rules or ethical business practices. However, findings of any violations are made only after a full investigation and an administrative hearing before an Exchange hearing panel. Any disciplinary actions taken are made public only through the news media.
 
 
 9
 Communications between the Exchange and Goldenblum continued during the spring of 1983 and included, inter alia, a request by Krupinski for information concerning a 1981 advertisement for the Spreads.
 
 
 10
 In the meantime, other disgruntled Spreads investors, represented by Edward Swan, Esq., had commenced Cresswell I in March 1983. Bache was represented by S & C, which assigned attorneys Marvin Schwartz, a partner, and Howard Burnett and John L. Hardiman, associates, to handle the matter. On June 6, 1983, Bache's Goldenblum informed Hardiman of NYSE's interest in the 1981 advertisement and forwarded to Hardiman copies of Bache's correspondence with NYSE in connection with Gregory's complaint. Bache in-house attorney Barbara Salmanson, after consulting with Schwartz, prepared a response to NYSE's request for information. She sent the response to Krupinski at NYSE on June 8 and sent a copy to Hardiman.
 
 
 11
 In August 1983, NYSE's Services Division referred the matter of the Bache Spreads to the Exchange's Division of Enforcement ("Enforcement"). On December 5, 1983, Donald E. Shippy, a Senior Enforcement Investigator, wrote Bache General Counsel Loren Schechter, indicating that Enforcement was investigating possible violations by Bache of NYSE's advertising standards. On December 9, Schechter responded that he would look into the matter. In the spring of 1984, there was further correspondence between Bache and Enforcement, and on July 11, 1984, Salmanson wrote Shippy describing the brochure promoting the Spreads and other documents, and stating that investors had been fully informed of the risks involved. A copy of the July 11 letter was sent to Burnett at S & C, who forwarded copies to Hardiman and Schwartz.
 
 
 12
 In August 1985, a settlement was reached between NYSE and Bache whereby, without admitting or denying guilt, Bache consented to a censure and a $5,000 fine. Based on this settlement, NYSE issued a decision in October stating that Bache had failed to disclose sufficiently the risks associated with the Spreads. The settlement was reported in the Wall Street Journal on February 12, 1986.
 
 
 13
 B. The Pretrial Discovery and Settlements in Cresswell I
 
 
 14
 By the time of the NYSE settlement and decision, most of the plaintiffs in Cresswell I had settled their suit. Prior to settlement, they had sought discovery concerning, inter alia, any stock exchange inquiries or investigations into the Bache Spreads.
 
 
 15
 Promptly after filing the Cresswell I complaint in March 1983, Swan made a request to Bache for the production of documents. In response, Bache produced more than 2,600 pages of documents in November 1983, including documents indicating that the Chicago Board of Trade ("CBOT") and the London Department of Trade ("LDOT") were investigating Bache's marketing of the Spreads. In December 1983, Swan served on S & C a second request for Bache documents demanding, inter alia,
 
 
 16
 [a]ny and all documents relating to any investigation or inquiry by any exchange, regulatory agency, or governmental body (whether in the United States or abroad) relating to defendant's marketing of the GNMA/T-Bond Spread which is the subject of this action.
 
 
 17
 This request was forwarded by Hardiman to Goldenblum at Bache, and though additional documents were produced, including some related to the CBOT and LDOT investigations, no documents relating to NYSE inquiries were produced.
 
 
 18
 On December 7, 1983, Gregory wrote to Swan, seeking to join the plaintiffs in Cresswell I. Gregory informed Swan in her letter that she had lodged a complaint with NYSE with regard to Bache's promotion of the Spreads. Gregory promptly became a plaintiff in Cresswell I and gave Swan some of the correspondence relating to her complaint to NYSE.
 
 
 19
 In June 1984, S & C's Burnett conducted Gregory's deposition; Gregory was represented at the deposition by Swan. Burnett marked as exhibits four documents relating to Gregory's complaint to NYSE, and identified some of them as having come not from Gregory, but from the files of Bache. Swan did not comment on the fact that these Bache documents had not been produced in response to plaintiffs' document demands, and he did not make any follow-up inquiry of S & C. Nor did he contact NYSE to ascertain whether it had undertaken any investigation as a result of Gregory's complaint.
 
 
 20
 At the deposition, Swan asked Gregory to provide him with her copies of the Bache documents and of any other correspondence she had had with NYSE, and S & C requested copies. No such copies were produced until September 1984, after S & C moved to compel their production.
 
 
 21
 The parties in Cresswell I began settlement negotiations in the summer of 1984. In November 1984, Swan and Schwartz agreed on a figure of approximately $3 million, which would have allowed each plaintiff to recoup 46% of the losses suffered. Swan met with most of the plaintiffs to discuss the proposal and thereafter sent all plaintiffs a 10-page letter recommending the settlement. By February 1985, all but two of the plaintiffs had agreed to accept the settlement, and a judgment was entered pursuant to Fed.R.Civ.P. 54(b), dismissing the complaint as to the settling plaintiffs with prejudice. One of the two remaining plaintiffs went to trial on his claims in November 1987; the other, Merana, Ltd. ("Merana"), as discussed below, entered into a separate settlement in July 1986.
 
 
 22
 The Wall Street Journal article reporting the NYSE's settlement with and finding of Bache appeared in February 1986. An attorney for Merana promptly informed S & C's Hardiman of the article, and Hardiman asked Bache in-house attorney Salmanson whether the article referred to the Spreads that had been at issue in Cresswell I. Salmanson confirmed that it did and apologized for perhaps not having kept S & C informed of Enforcement's action. She immediately sent Hardiman copies of all of the documents relating to the matter described in the article, again apologizing, and copies of the documents were then forwarded to Swan and to Merana's attorney. In July 1986, Merana settled with Bache for $300,000 plus legal fees, which represented 93.99% of its claimed losses. In January 1987, the plaintiffs in another action arising out of the Spreads also settled with Bache; they recovered 71% of their losses.
 
 C. The Present Action
 
 23
 In April 1986, Swan wrote to the Cresswell I plaintiffs who had settled, informing them of the report of Enforcement's investigation. He stated that Bache's earlier nonproduction of the documents could constitute grounds for an additional monetary recovery, and he offered to negotiate a further settlement in return for 25% of any additional amount recovered; he stated, however, that if further litigation were required, "other arrangements will have to be made." Swan then met with Schwartz and Hardiman and stated that the failure to produce the documents had adversely affected the amount of the original settlement; he advised them that unless the payment to his clients were increased, he would bring a new suit. Schwartz rejected Swan's request for an additional settlement payment.
 
 
 24
 In April 1987, plaintiffs, now represented principally by Cooper, Brown & Behrle, P.C. ("Cooper-Brown"), commenced the present action against Bache and S & C ("Cresswell II "), alleging that in failing to produce the documents pertaining to the Enforcement investigation and the Services Division inquiry, Bache and S & C had committed fraud or had been grossly negligent, and that nonproduction had led plaintiffs to accept an artificially low settlement. In connection with these allegations, depositions of, inter alios, Schwartz, Hardiman, and Swan were taken.
 
 
 25
 Hardiman and Schwartz testified that they had not been contemporaneously informed by Bache of the communications from the Enforcement division and were not aware of Enforcement's actions until the Wall Street Journal 's report in early 1986 of the censure and fine. Schwartz stated that Bache's Schechter had told him that Bache would handle any investigations by exchanges in-house, without S & C's help. Schwartz testified that he had viewed those NYSE communications of which he was aware, i.e., the Services Division's responses to Gregory's complaint, as not amounting to an "investigation or inquiry," and he therefore believed the correspondence arising out of that complaint was not called for by the discovery request.
 
 
 26
 Swan, in his deposition, testified that he had served plaintiffs' second document demand, calling specifically for documents relating to regulatory body investigations, because he had noticed among the documents produced in response to the first request those relating to CBOT and LDOT investigations. Swan did not, however, recall making any inquiry of CBOT or LDOT with regard to their investigations of Bache. Nor did he make any inquiry of the Securities Exchange Commission, the National Association of Securities Dealers, or the Commodities Futures Trading Commission as to whether they were investigating Bache's marketing of the Spreads. Swan also testified that when S & C produced Goldenblum's March 28, 1983 letter to NYSE at Gregory's deposition, he viewed it as responsive to the second request for documents; but he testified that he thought the nonproduction had been inadvertent, and therefore he did not ask S & C why the document had not been produced in response to that request. He also did not ask whether there were any other related documents that had not been produced. Nor did he make any inquiry of NYSE. Swan's 10-page letter to the Cresswell I plaintiffs in December 1984, recommending settlement, had not suggested as a factor favoring settlement either that no regulatory bodies were investigating or that regulatory bodies had investigated and had taken no action as a result. Swan had never discussed the activities of any regulatory body with his associate who worked on Cresswell I.
 
 
 27
 In July 1988, S & C moved for summary judgment dismissing the claims against it on the grounds that plaintiffs could not show intent, materiality, or justifiable reliance. S & C argued that plaintiffs could not show fraudulent intent because S & C (a) had had no knowledge prior to producing documents in response to the second request that there had been any inquiry from Enforcement, (b) had played no role in the Enforcement investigation of Bache, (c) had had no knowledge of the NYSE settlement until many months after the Cresswell I settlement was concluded, and (d) had marked documents relating to the Enforcement investigation at the Gregory deposition at which Swan had been present. S & C also argued that its nondisclosure was not material, pointing to, inter alia, deposition testimony by Krupinski that it was "rare" for customer complaints received by the Services Division to lead to disciplinary action, and that only 5% of the complaints she handled even reached the stage of a recommendation to her supervisor that the matter be referred to Enforcement for investigation. Shippy, who handled the investigation for Enforcement, testified that his investigation had "nothing to do with the individuals who were suing the firm." Finally, emphasizing (a) Swan's failure to inquire of S & C or NYSE after receiving the documents from Gregory in January 1984 and even after seeing the documents from Bache's files at the deposition in June 1984, (b) Swan's failure to inquire of any other regulatory body with regard to investigations revealed in the documents produced, (c) the failure of Swan's letter recommending settlement to mention either the inquiry by any exchange or the lack of any such inquiry, and (d) the fact that Swan never even discussed regulatory investigations with his associate, S & C argued that (1) plaintiffs could not have relied on nonproduction of the documents to indicate that there was no NYSE investigation and (2) in any event, in light of the documents of which Swan was indisputably aware, any such reliance would not have been justifiable.
 
 
 28
 In opposition to S & C's motion for summary judgment, plaintiffs asserted that there were genuine issues of fact to be tried with respect to, inter alia, their contentions (a) that S & C had made an untrue implied representation that there were no documents relating to any inquiry by NYSE into Bache's marketing of the spreads, (b) that "Sullivan & Cromwell knew its representations were not true and that it had withheld requested documents," (c) that prior to December 1983, S & C "had in its possession all of the documents of the Exchange Inquiry and knew that they existed," and (d) that "[a]t all relevant times Sullivan & Cromwell intended to deceive Swan." Swan submitted an affidavit stating that he had relied on S & C's nonproduction as a representation that there was no NYSE investigation.
 
 
 29
 After submitting their opposition to the motion for summary judgment, plaintiffs moved for leave to amend their complaint in order to assert a claim against S & C under the New York Judiciary Law Sec. 487 (McKinney 1983). That section provides, in pertinent part, that an attorney who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion with intent to deceive the Court or any party ... [i]s guilty of a misdemeanor, and ... forfeits to the party injured treble damages, to be recovered in a civil action." Plaintiffs' attorney stated that the claim had not been asserted in the original April 1987 Cresswell II complaint or in the amended complaints filed thereafter because counsel was unaware of this law.
 
 
 30
 In an Opinion dated January 12, 1989 ("Opinion"), 704 F.Supp. 392, the district court denied plaintiffs' motion to amend on the ground that it was inexcusably belated, and it granted S & C's motion for summary judgment on one of the three grounds advanced. The court ruled that summary judgment could not be granted on the basis of lack of intent because the record raised genuine issues of fact as to that element. While noting that there was no evidence that S & C knew about the December 1983 exchange of correspondence between NYSE and Bache until after Cresswell I was settled, the court found that when all inferences were drawn in favor of plaintiffs, as the nonmoving side, a question of fact existed as to whether S & C intentionally withheld the July 11, 1984 letter in hopes of achieving a settlement before the results of the inquiry became known. Further, the court found that summary judgment could not be granted for lack of materiality. Though noting that Shippy, who handled the investigation for Enforcement, testified that the investigation had "nothing to do with the individuals who were suing the firm," the court observed that the test of materiality is what effect knowledge of the investigation would have had on a reasonable person in plaintiffs' position, not how the investigation would have been viewed by the Exchange or a bystander. Noting the larger settlements that were reached after disclosure of the Exchange investigation, the court concluded that there was a factual issue to be tried as to the materiality of the nondisclosure.
 
 
 31
 Nonetheless, the court found that, as a matter of law, plaintiffs could not show justifiable reliance on S & C's failure to produce the Bache-Exchange correspondence with regard to Gregory's complaint. Noting that when a party has the means of " 'knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations,' " 704 F.Supp. at 410 (quoting Cudemo v. Al & Lou Construction Co., 54 A.D.2d 995, 387 N.Y.S.2d 929, 930 (3d Dep't 1976)), the court found that plaintiffs were not entitled to complain of S & C's nondisclosure.
 
 
 32
 Swan knew not only about the Polly Gregory exchange but that Sullivan and Cromwell had not produced them in response to his request. By June, 1984, at Gregory's deposition, Swan knew that Bache had corresponded with the NYSE, and that Sullivan and Cromwell had in its possession documents which Swan considered to be responsive to the Second Document Request, but which had not been produced. Swan conceded that at least one of the documents marked by Burnett was responsive to his Second Document Request and had not been produced. Despite this, Swan did not ask Burnett--or anyone else at Sullivan and Cromwell--why any of the documents had not been produced in response to the Second Document Request or for the Polly Gregory file, nor was his document demand renewed or amended.
 
 
 33
 Under these circumstances, even if Swan did rely on Sullivan and Cromwell's representation, and even if he believed that the failure to turn over the documents was an inadvertent omission, his reliance on Sullivan and Cromwell's representation was not reasonable. He never sought to depose Goldenblum, although he knew that Goldenblum had communicated with the Exchange. He did not contact the Exchange, even though he knew that the Exchange sometimes examined customer complaints. He did not contact the CBOT--the Exchange on which the Spreads were traded--about its investigation, nor did he discuss the activities of regulatory bodies with his clients or even with his associate. For all of these reasons, Swan could not have reasonably relied on Sullivan and Cromwell's response.
 
 
 34
 ....
 
 
 35
 Swan's conclusory declaration that he relied upon Sullivan and Cromwell's representation is overcome by the undisputed facts set forth above.... Plaintiffs have failed to establish reasonable reliance, and Sullivan and Cromwell's motion for summary judgment is thus granted.
 
 
 36
 Opinion 704 F.Supp. at 409-410.
 
 
 37
 Contemporaneously with S & C's summary judgment motion, Bache had moved to preclude Swan from testifying in the case on the ground that his testimony would be a violation of professional ethics. Cooper-Brown's agreement with plaintiffs called for that firm to receive one-third of plaintiffs' net recovery, and Swan's agreement with Cooper-Brown called for him to receive "one sixth of the total net attorneys' fees" obtained by Cooper-Brown. In exchange, Swan agreed to waive and assign any claims he might have against the plaintiffs for further fees, or against Bache or S & C, and to continue working on the case as an attorney. Bache contended that this fee agreement violated the disciplinary Rules of the American Bar Association Code of Professional Responsibility.
 
 
 38
 The court denied Bache's motion to preclude Swan from testifying, stating that because "Swan's testimony on the facts provides direct evidence as to the conduct of the defendants[,] ... [s]ubstantial justice requires the testimony." Opinion 704 F.Supp. at 404. It ruled, however, that in light of the need for this testimony, Swan's collaboration with Cooper-Brown violated the rule prohibiting an attorney from representing a party in an action in which he will or should be called as a witness, see Disciplinary Rule 5-101(B). In addition, noting Swan's "admi[ssion] that, pursuant to the [fee] Agreement, his payment in this case will be 'contingent to a substantial extent' upon the outcome of the case and that he is a central fact witness for plaintiffs," Opinion at 401, the court ruled that the agreement violated Disciplinary Rule 7-109(C) of the Code, which prohibits payment to a witness of a fee that is contingent on the outcome of the case. Accordingly, the court ruled that Swan should be disqualified from working on the case except as a witness and barred from receiving a contingent fee in the action.
 
 
 39
 Following issuance of the Opinion granting summary judgment in favor of S & C, disqualifying Swan from representing plaintiffs, and voiding his contingent fee agreement, the parties stipulated to a dismissal of the claims against Bache. A final judgment was entered dismissing the complaint, and this appeal followed.
 
 
 40
 On appeal, plaintiffs contend principally that the district court erred in (a) granting summary judgment in favor of S & C, (b) refusing to allow them to amend their complaint, and (c) precluding Swan from serving as their attorney in this case and accepting a contingent fee. We consider initially, however, the question of federal jurisdiction, which was raised for the first time by this Court at oral argument. We conclude that the district court had jurisdiction, though not on the basis asserted below, and that in light of the proper basis for federal jurisdiction, it is appropriate to remand to the district court for consideration of S & C's motion to dismiss within the proper legal framework.
 
 II. FEDERAL JURISDICTION
 
 41
 The complaint asserted two bases of subject matter jurisdiction: (1) diversity of citizenship "except as to [three named plaintiffs]," and (2) jurisdiction "ancillary and pendent to [Cresswell I ] ... and to the existence of Federal questions arising under the Commodity Exchange Act (7 U.S.C. Sec. 1 et seq.), 28 U.S.C. Secs. 1332 [sic ] and 1927, and Federal Rules of Civil Procedure, including Rules 26(e), 34, 41(a) and 54(b)." At oral argument, we questioned the validity of these bases for the assertion of jurisdiction, and the parties filed supplemental briefs on this issue. For the reasons below, we conclude that there is neither diversity jurisdiction nor federal question jurisdiction under the provisions relied on by plaintiffs. We are persuaded, however, that the district court had ancillary equitable jurisdiction to entertain the action.
 
 A. Diversity Jurisdiction
 
 42
 The federal diversity statute, to the extent pertinent here, gives the district courts jurisdiction (a) over cases between "citizens of different States," and (b) over cases between "citizens of a State" and "citizens or subjects of a foreign State." 28 U.S.C. Sec. 1332(a) (1988). It is well established that for a case to come within this statute there must be complete diversity and that diversity is not complete if any plaintiff is a citizen of the same state as any defendant. See, e.g., Owen Equipment & Erection Co. v. Kroger, 437 U.S. 365, 373-74, 98 S.Ct. 2396, 2402-03, 57 L.Ed.2d 274 (1978); Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806). United States citizens who are domiciled abroad are neither citizens of any state of the United States nor citizens or subjects of a foreign state, and Sec. 1332(a) does not provide that the courts have jurisdiction over a suit to which such persons are parties. Though we are unclear as to Congress's rationale for not granting United States citizens domiciled abroad rights parallel to those it accords to foreign nationals, the language of Sec. 1332(a) is specific and requires the conclusion that a suit by or against United States citizens domiciled abroad may not be premised on diversity. See Smith v. Carter, 545 F.2d 909 (5th Cir.), cert. denied, 431 U.S. 955, 97 S.Ct. 2677, 53 L.Ed.2d 272 (1977); see also 1 Moore's Federal Practice p 0.74 (1990); 13B C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 3621, at 577-78 (1984).
 
 
 43
 According to the complaint, though most of the plaintiffs are citizens of foreign countries, three plaintiffs are United States citizens who permanently reside abroad. Under the above principles, therefore, since not all of the plaintiffs are entitled to sue in federal court based on the diversity statute, plaintiffs may not maintain this suit on the basis of diversity.
 
 
 44
 In response to our raising this issue, plaintiffs have suggested that the three plaintiffs who are United States citizens residing abroad might be dropped from the suit. Though there is authority for permitting the dismissal of claims against nondiverse defendants in order to cure a defect in diversity jurisdiction, see, e.g., Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989) (upholding power of court of appeals to dismiss claims against nondiverse defendants "with prejudice"), the dismissal of the three nonqualifying plaintiffs in the present case may not provide a cure, because S & C has advised the Court that several of its own partners are United States citizens who reside abroad and that at least one of them has maintained his primary residence in France for more than a decade. Plaintiffs have not challenged S & C's representation, and indeed, the complaint itself suggests that two of S & C's partners may be domiciled in foreign countries. If in fact any of S & C's foreign-residing United States citizen partners are domiciled abroad, a diversity suit could not be brought against them individually; in that circumstance, since for diversity purposes a partnership is deemed to take on the citizenship of each of its partners, see Great Southern Fire Proof Hotel Co. v. Jones, 177 U.S. 449, 456, 20 S.Ct. 690, 698, 44 L.Ed. 842 (1900); Lewis v. Odell, 503 F.2d 445, 446 (2d Cir.1974); Coudert Bros. v. Easyfind International, Inc., 601 F.Supp. 525 (S.D.N.Y.1985), a suit against S & C could not be premised on diversity.
 
 B. Federal Question Jurisdiction
 
 45
 Plaintiffs also pursue their contentions that the district court had jurisdiction to hear this case by reason of its federal question jurisdiction over Cresswell I and its power under 28 U.S.C. Sec. 1927 to award plaintiffs attorneys' fees for increased costs as a result of the alleged nondisclosures in Cresswell I. We disagree.
 
 
 46
 In Cresswell I, the district court had federal question jurisdiction under 28 U.S.C. Sec. 1331 because the claims in that action sought relief under the Commodity Exchange Act, 7 U.S.C. Sec. 1 et seq. That circumstance is not present here. None of the claims against S & C depends on the merits of plaintiffs' Cresswell I claims or the quality of Bache's disclosures to potential investors in its Spreads. There is no question here as to whether Bache's representations constituted violations of the Commodity Exchange Act, and there is no contention that the conduct of S & C violated any federal statute. Rather, plaintiffs' claim is that S & C committed common-law fraud.
 
 
 47
 Nor may federal question jurisdiction be premised on Sec. 1927, for that section does not appear to authorize an independent lawsuit. It provides that an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. Sec. 1927. The power thereby described is the power of the courts to punish an attorney who conducts frivolous or dilatory litigation by awarding the other side compensation "as part of the costs in the litigation." Roadway Express, Inc. v. Piper, 447 U.S. 752, 770, 100 S.Ct. 2455, 2466, 65 L.Ed.2d 488 (1980) (Stevens, J., concurring in part and dissenting from view that prior version of Sec. 1927, which did not expressly mention attorneys' fees, did not mean "costs" to include such fees). Though under the present Sec. 1927 "attorneys' fees were intended to be among the costs which a party could request after litigation was completed," the request for such an award is nonetheless made in the case in which the attorney's unreasonable conduct is alleged to have occurred. See Gordon v. Heimann, 715 F.2d 531, 537 (11th Cir.1983). We have seen no basis for concluding that Sec. 1927 was intended to permit a litigant to institute a new lawsuit to collect excess costs and fees incurred in a prior litigation. Indeed, since plaintiffs' claim is not that the proceedings in Cresswell I were multiplied but that plaintiffs are required to pursue the present action, this suit seeks recovery under Sec. 1927 of excess costs and fees not yet incurred when the Sec. 1927 claim was asserted. As a statute with a punitive thrust, Sec. 1927 is to be strictly construed, see Mone v. Commissioner of Internal Revenue, 774 F.2d 570, 574 (2d Cir.1985), and we cannot conclude that it provides a basis for the present suit.
 
 
 48
 The complaint's attempt to premise jurisdiction on the alleged violations of various Federal Rules of Civil Procedure is no more meritorious. The Rules do not provide an independent ground for subject matter jurisdiction over an action for which there is no other basis for jurisdiction. See Fed.R.Civ.P. 82 ("[t]hese rules shall not be construed to extend or limit the jurisdiction of the United States district courts ..."); see also Snyder v. Harris, 394 U.S. 332, 337-38, 89 S.Ct. 1053, 1057, 22 L.Ed.2d 319 (1969).
 
 
 49
 Notwithstanding the absence of federal question jurisdiction and the apparent absence of diversity, however, we conclude for the reasons below that the court had ancillary equitable jurisdiction to entertain an attack on the Cresswell I judgment.
 
 C. Ancillary Equitable Jurisdiction
 
 50
 Rule 60(b) provides, in pertinent part, that a party may make a motion seeking relief from a final judgment on the grounds of, inter alia, "fraud ..., misrepresentation, or other misconduct of an adverse party." Fed.R.Civ.P. 60(b)(3). The Rule also states that provision for such a motion "does not limit the power of a court to entertain an independent action to relieve a party from a judgment [or] order." Fed.R.Civ.P. 60(b). The independent action referred to in this Rule is "what had been historically known simply as an independent action in equity to obtain relief from a judgment." 11 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2868, at 238 (1973).
 
 
 51
 If a party were to proceed under Rule 60(b) by motion in the underlying suit, the court would of course have jurisdiction to decide the motion because of its jurisdiction of the suit. An independent action for relief from the judgment, however, must be supported by its own jurisdictional grounds. When the basis for federal jurisdiction of the original suit no longer exists, either because there is no longer diversity of citizenship or because the claims in the new suit do not arise under federal law, the district court that entered the original judgment has inherent "ancillary" equitable jurisdiction to entertain the suit for relief from the judgment. See, e.g., Pacific R.R. of Missouri v. Missouri Pac. Ry. Co., 111 U.S. 505, 521-22, 4 S.Ct. 583, 592-93, 28 L.Ed. 498 (1884) (though the diversity on which jurisdiction of the earlier suit rested did not exist in the second suit, "there can be no doubt that the [lower court that entered the earlier decree] had jurisdiction" over a suit to vacate that decree for alleged fraud); Martina Theatre Corp. v. Schine Chain Theatres, Inc., 278 F.2d 798, 800 n. 1 (2d Cir.1960) (when the action to set aside judgment "is brought in the federal court that rendered the initial judgment, there is ancillary jurisdiction over the action despite absence of a federal question or diversity of citizenship").
 
 
 52
 Ancillary jurisdiction is sufficiently flexible that the action may be maintained against a person who was not a party to the original action. See, e.g., Valerio v. Boise Cascade Corp., 645 F.2d 699, 700 (9th Cir.) (per curiam), cert. denied, 454 U.S. 1126 (1981); 7 Moore's Federal Practice p 60.38, at 60-398 (1990). For example, parties who seek to vacate a judgment on the ground of fraud on the court are allowed to join as defendants in the second suit persons who were attorneys, not parties, in the first suit. See Valerio v. Boise Cascade Corp., 645 F.2d at 700.
 
 
 53
 Since Cresswell I, like the present action, was brought in the Southern District of New York, we conclude that the district court had ancillary equitable jurisdiction over the present claims against S & C.III. THE MERITS
 
 
 54
 On the merits, plaintiffs contend that (a) S & C was not entitled to summary judgment because there existed a genuine issue of fact as to whether Swan justifiably relied on S & C's implied representation that all pertinent documents had been produced; (b) the district court should have allowed them to amend their second amended complaint to assert another basis for recovery; and (c) the court erred in barring Swan from participating in this case as plaintiffs' attorney and from accepting a contingent fee. We conclude that the claims against S & C should be remanded for consideration within the proper jurisdictional framework and that plaintiffs' other contentions lack merit.
 
 A. Summary Judgment in Favor of S & C
 
 55
 In granting summary judgment in favor of S & C, the district court ruled that, as a matter of law, Swan could not reasonably have relied on S & C's nonproduction to conclude that there were no documents relating to any inquiry or investigation of the Bache Spreads by NYSE. We are inclined toward the view that, if this were an ordinary common-law fraud action, we would affirm. The issue of justifiability of reliance is not one that is inherently unsuitable for determination as a matter of law, and the record supports the district court's finding that Swan had actual knowledge that not all of the documents he thought he had called for had been produced. It is indisputable, for example, that Swan had some of the unproduced documents in his possession, having been given them by Gregory more than a year before the settlement. He also received copies of unproduced NYSE-related documents from S & C when he represented Gregory at her deposition; at that time Burnett explicitly identified those documents as having come from the files of Bache. Swan had available obvious means for determining whether there were other such documents or other information of which he was unaware, such as inquiring of S & C or contacting NYSE. Instead, he made no effort whatever to follow up or inquire. Considering this issue solely as a matter of law, we would conclude that the district court did not err in ruling that if Swan relied on the earlier nonproduction to mean that there were no such documents, he did not do so justifiably.
 
 
 56
 As indicated in Part II.C. above, however, the present action is not an action at law but is one addressed to the court's equity powers. See generally Martina Theatre Corp. v. Schine Chain Theatres, Inc., 278 F.2d 798; 7 Moore's Federal Practice p 60.38 (1990). Decisions in such an action are committed to the court's discretion, informed by traditional equitable principles. Thus, in order to pursue an independent action to set aside a judgment, a plaintiff
 
 
 57
 must show a recognized ground, such as fraud ..., for equitable relief and that there is no other available or adequate remedy. It must also appear that the situation in which the party seeking relief finds himself is not due to his own fault, neglect or carelessness. In this type of action, it is fundamental that equity will not grant relief if the complaining party "has, or by exercising proper diligence would have had, an adequate remedy at law, or by proceedings in the original action * * * to open, vacate, modify, or otherwise obtain relief against, the judgment." The granting of relief in this unusual type of proceeding lies largely within the discretion of the trial judge.
 
 
 58
 Winfield Associates, Inc. v. Stonecipher, 429 F.2d 1087, 1090 (10th Cir.1970) (emphasis added). Most important for purposes of the present case is the principle that in order to obtain the requested equitable relief, a plaintiff must show "the absence of fault or negligence" on his own part. Bankers Mortgage Co. v. United States, 423 F.2d 73, 79 (5th Cir.), cert. denied, 399 U.S. 927, 90 S.Ct. 2242, 26 L.Ed.2d 793 (1970); see 11 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2868, at 238.
 
 
 59
 In the present case, the district court did not make its findings within this framework. Rather, both the court and the parties treated the action as one at law and the court dismissed the claims against S & C solely on the basis of its ruling that any reliance by Swan was, as a matter of law, not justifiable. It is, of course, arguable that this ruling means that the court would not find that the situation in which plaintiffs find themselves is not due to their own attorney's neglect. Since, however, the court did not purport to decide the latter question or to exercise its discretion or its equitable powers, and since the decision of such questions should be made by the district court in the first instance, we conclude that the matter should be remanded for consideration in light of these principles.
 
 
 60
 B. The Denial of Leave To Amend the Complaint
 
 
 61
 In October 1988, plaintiffs unsuccessfully moved for leave to amend their complaint to include a claim under New York Judiciary Law Sec. 487, which grants an injured party a private right of action for treble damages against an attorney who is guilty of intentionally deceiving the court. They contend that the district court's denial of their motion to amend was an abuse of discretion. We disagree.
 
 
 62
 Generally, permission to amend should be freely granted. See Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). The court plainly has discretion, however, to deny leave to amend where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice the defendant. See, e.g., Tokio Marine & Fire Insurance Co. v. Employers Insurance of Wausau, 786 F.2d 101, 103 (2d Cir.1986). The burden is on the party who wishes to amend to provide a satisfactory explanation for the delay, see Sanders v. Thrall Car Mfg. Co., 582 F.Supp. 945, 952 (S.D.N.Y.1983), aff'd, 730 F.2d 910 (2d Cir.1984), and the court is free to conclude that ignorance of the law is an unsatisfactory excuse, see, e.g., Goss v. Revlon, Inc., 548 F.2d 405, 407 (2d Cir.1976).
 
 
 63
 In the present case, plaintiffs filed their initial complaint in April 1987. In May 1987, they filed an amended complaint. In March 1988, near the end of a yearlong period of discovery, plaintiffs were allowed to file a second amended complaint. In July 1988, discovery having been completed, S & C moved for summary judgment. Plaintiffs responded to that motion in August 1988. They did not move to amend their second amended complaint to assert the Sec. 487 claim until September 30, 1988, i.e., more than 17 months after bringing suit, more than six months after filing their second amended complaint, and more than one month after responding to the motion for summary judgment. The only excuse offered for the delay was that plaintiffs' counsel had been unaware of Sec. 487.
 
 
 64
 The district court denied the motion to amend, noting that Sec. 487 was hardly new, having been in effect in its present form for some two decades, and finding that S & C would be prejudiced by plaintiffs' inordinate delay in making this motion. In all the circumstances, we see no abuse of discretion in the denial of the motion.
 
 C. The Disqualification of Swan
 
 65
 Finally, plaintiffs challenge the district court's order disqualifying Swan from participation in this case as their attorney and barring him from receiving a contingent fee. They contend principally that Disciplinary Rules 5-101(B) and 7-109(C) of the Code of Professional Responsibility were not applicable because the fee agreement between Swan and Cooper-Brown states that Swan's "rights to payment ... shall be entirely independent of [his] testimony and shall not be affected if [he does] not testify," and that the court should have refrained from disqualifying Swan because Disciplinary Rule 5-101(B)(4) makes an exception for cases in which the client will suffer a "substantial hardship" if the attorney cannot represent him. We reject these arguments.
 
 
 66
 The disqualification of an attorney in order to forestall violation of ethical principles is a matter committed to the sound discretion of the district court. See, e.g., Allegaert v. Perot, 565 F.2d 246, 248 (2d Cir.1977); W.T. Grant Co. v. Haines, 531 F.2d 671, 676 (2d Cir.1976); Hull v. Celanese Corp., 513 F.2d 568, 571 (2d Cir.1975). Disciplinary Rule 5-101(B) of the ABA Code provides that "A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he ... ought to be called as a witness...." Disciplinary Rule 7-109(C) provides that "A lawyer shall not ... acquiesce in the payment of compensation to a witness contingent upon the content of his testimony or the outcome of the case."
 
 
 67
 Notwithstanding the language of Swan's fee agreement, purporting to make his right to payment independent of his testimony, the facts remain that (a) the agreement gave Swan the right to receive one-sixth of any fees received in this by Cooper-Brown, (b) Cooper-Brown's fee was contingent on plaintiffs' recovery, and (c) Swan's testimony would be essential to the proof of plaintiffs' claims. The disqualification of Swan was appropriate substantially for the reasons stated by the district court and was well within the bounds of discretion. Nor have plaintiffs shown any respect in which they will suffer hardship if Swan is allowed only to testify and not to act as their attorney and if he is barred from agreeing to a contingent fee. The record provides no basis on which we might conclude that the hardships to plaintiffs, if any, would outweigh the ethical considerations.
 
 
 68
 After oral argument of this appeal, plaintiffs wrote to advise us that New York State would soon adopt a modified version of Disciplinary Rule 5-101(B) allowing an attorney who is to be a trial witness to represent a party in a capacity other than that of "advocate." Such a modification would appear to have no bearing on the ruling that Swan may not accept a contingent fee. However, we do not preclude the district court's reconsideration, if necessary, of the extent of Swan's disqualification in the light of any pertinent new rules.
 
 CONCLUSION
 
 69
 We have considered all of plaintiffs' arguments challenging the district court's judgment and orders, and, except to the extent indicated above, have found them to be without merit. The judgment dismissing the claims against S & C is vacated, and the matter is remanded to permit the district court to consider those claims as a court of equity.
 
 
 70
 No costs.
 
 
 
 *
 Honorable Betty B. Fletcher, United States Court of Appeals for the Ninth Circuit, sitting by designation