**BLUE CROSS AND BLUE SHIELD OF NEW JERSEY, et al. Plaintiffs,**

v.

**PHILIP MORRIS, INC., et al., Defendants.**

**No. 98 CV 3287(JBW).**

United States District Court, E.D. New York.

June 18, 1999.

Dewey Ballantine LLP, New York City, by Paul J. Bschorr, for the plaintiffs.

Winston & Strawn, Chicago, IL, by Dan K. Webb, Steven M. Barna, for Philip Morris, Inc.

**340**

## MEMORANDUM AND ORDER

WEINSTEIN, Senior District Judge.

### I. Introduction

Two plaintiffs, Empire Blue Cross and Blue Shield (Empire) and Group Hospitalization & Medical Services d/b/a Blue Cross Blue Shield of the National Capital Area (National), move to disqualify the law firm of Winston & Strawn (the firm) from appearing for defendant, Philip Morris, Inc., in this tobacco tort case. The firm at one time represented Empire and National on unrelated matters. It had formally contracted with these two former clients not to represent Philip Morris in the instant case, but it now claims that agreement is unenforceable. The firm cross-moved for permission to represent Philip Morris.

The chances of an actual conflict are insignificant. Nevertheless, despite the lack of conflict and the strong public policy favoring unrestricted choice of counsel, the motion to disqualify is granted to avoid what many laypersons might consider a conflict of interest. This case is based on an alleged mass tort indirectly involving the welfare of millions of Blue Cross insureds. It is likely that many among them would consider the firm a turncoat. What might be acceptable in a simple one-client case is not appropriate in massive cases where it is impossible to explain to each person involved the technical points of ethics that support the lawyers' legal positions. Apparent conflicts can be decisive in such cases where ethics issues are particularly severe.

### II. Facts

This suit is one of three coordinated actions brought by many Blue Cross and Blue Shield plans against the major tobacco companies for damages resulting from the medical treatment of tobacco-related diseases. Blue Cross and Blue Shield Plans across the country have tens of millions of insureds. *See Blue Cross and Blue Shield of New Jersey v. Philip Morris, Inc.,* 36 F.Supp.2d 560 (E.D.N.Y.1999). Suits were filed on April 29, 1998, in New York, in Chicago and in Seattle. At the time of the filing, Empire and National, two of the twenty-one plaintiffs in the New York action, were clients of the firm, which had represented Philip Morris in other tobacco litigation. Philip Morris sought to have the firm represent it in the Chicago action and to help coordinate the joint industry defense of all three actions.

Empire and National opposed the firm's involvement in the suits on the ground that it would create a conflict of interest. The firm, they contended, might use information obtained through its representation of them (albeit in matters unrelated to tobacco) against its sister Blue Cross and Blue Shield Plans involved in the Chicago and Seattle actions and might transfer work done in connection with those suits to Philip Morris' New York counsel for use against Empire and National. Philip Morris disagreed, asserting that, in any event, advance waivers of future conflicts signed by Empire and National at the time they retained the firm precluded a conflict of interest challenge to its involvement in the tobacco suits. Empire and National contended that the waivers were unenforceable.

This dispute was resolved by agreement dated June 4, 1998 (the Agreement). It provided, in essence, that Empire and National would not seek to disqualify the firm from appearing in the Chicago or Seattle actions or from participating in the coordinated industry defense of all three actions and that, in exchange, the firm would not appear in the New York action. The Agreement included no references to circumstances or time limits qualifying or restricting either party's obligations. Drafted by the firm and addressed to plaintiffs' counsel, Dewey Ballantine, it read as follows:

> On behalf of you and your clients in the above-captioned actions, you agree as follows:
>
> You and your clients in the above-captioned actions will not seek to disqualify Winston & Strawn, or any of its

attorneys, from representing Philip Morris Incorporated ("Philip Morris") or participating in the Chicago Action or the Seattle Action based on the fact that Winston & Strawn has performed or is performing work for Empire Blue Cross and Blue Shield ("Empire") and Group Hospitalization & Medical Service, Inc., d/b/a Blue Cross and Blue Shield of the National Capital Area ("National") on various specific matters that we contend are not substantially related to the above-captioned actions.

You and your clients in the above-captioned actions will not seek to disqualify Winston & Strawn, or any of its attorneys, from acting as counsel to Philip Morris in the Chicago Action or the Seattle Action in any multi-district or other coordinated or consolidated proceeding relating to the above-captioned actions based on the fact that Winston & Strawn has performed or is performing work for Empire and National on various specific matters that we contend are not substantially related to the above-captioned actions.

You and your clients in the above-captioned actions will not seek to disqualify any other attorney or law firm representing any of the defendants in the above-captioned actions based on the fact that such attorney or law firm and any Winston & Strawn attorney representing Philip Morris in the Chicago Action or the Seattle Action have had or will have confidential communications concerning or relating to any or all of the above-captioned actions.

In return, I on behalf of Winston & Strawn, agree as follows:

Winston & Strawn, or any of its attorneys, shall not file an appearance or otherwise appear on the pleadings in the New York action.

Winston & Strawn, or any of its attorneys, shall not direct any discovery at Empire or National, or participate in any questioning, at depositions, trial, or otherwise, of any present or former offi-cers, directors, or employees of Empire or National.

Winston & Strawn has established and will continue to maintain a screen between, on the one hand, any of its attorneys and employees representing Philip Morris in the Chicago Action, the Seattle Action, or any multi-district or other coordinated or consolidated proceeding relating to the above-captioned action, and any other attorneys representing Philip Morris in any of the three actions, and, on the other hand, any of its attorneys and employees who have performed or are performing work on matters for Empire and National, such that no confidential information of Empire and National received by attorneys and employees who have performed or are performing such work on either's behalf is communicated by those attorneys and employees to attorneys and employees representing or performing work on behalf of Philip Morris.

In September 1998, the firm concluded its representation of National. In March 1999, Empire terminated its relationship with the firm when the partner who had been handling Empire's work left.

Two months later, in May of 1999, the firm's New York office appeared in this New York action on behalf of Philip Morris. The following day, various firm attorneys moved for admission *pro hac vice*. In response, Empire and National moved to disqualify the firm.

## III. Law

### A. Governing Ethics Rules

█ The interpretation and application of the rules of ethics to the conduct of attorneys appearing in federal court ultimately is controlled by federal law. *See, e.g., Grievance Committee for the Southern District of New York v. Simels,* 48 F.3d 640, 645 (2d Cir.1995) (in interpreting rules of ethics "well established principles of federalism require that federal courts

not be bound by either the interpretations of state courts or opinions of various bar association committees"); *Polycast Technology Corp. v. Uniroyal, Inc.*, 129 F.R.D. 621, 624 (S.D.N.Y.1990) ("Federal law governs the conduct of attorneys in the federal courts."); *Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1407, 1413 (E.D.N.Y. 1989) ("A federal court is not bound to enforce New York's view of what constitutes ethical professional conduct.").

■ Whether to disqualify counsel is a matter subject to the trial court's sound discretion. *See, e.g., Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir.1990) ("The disqualification of an attorney in order to forestall violation of ethical principles is a matter committed to the sound discretion of the district court."); *Brooks v. Knowledge Engineering*, 1994 WL 121851, at * 2 (S.D.N.Y. Apr.7, 1994) (citing *Fund of Funds Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225 (2d Cir.1977)).

In making this determination federal district courts in New York consult the ABA Model Rules of Professional Conduct (Model Rules), the ABA Model Code of Professional Responsibility (Model Code) and the New York Code of Professional Responsibility (New York Code). While these rules are not binding, courts look to them for guidance in regulating the professional conduct of attorneys appearing before them. *See, e.g., GPA Inc. v. Liggett Group, Inc.*, 1994 WL 613267, at *1 n. 1 (S.D.N.Y. Nov.4, 1994) (citing *United States v. Kwang Fu Peng* 766 F.2d 82, 87 n. 1 (2d Cir.1985)); *Brooks v. Knowledge Engineering*, 1994 WL 121851, at *2 (S.D.N.Y. Apr.7, 1994); *Kubin v. Miller*, 801 F.Supp. 1101, 1114 n. 9 (S.D.N.Y.1992). "In practice, the courts of the Second Circuit look to the Code of Professional Responsibility as adopted in the district courts' rules." *Polycast Technology Corp. v. Uniroyal, Inc.*, 1990 WL 180571, at *1 (S.D.N.Y. Nov.15, 1990). *Cf.* Federal Bar Council Committee on the Second Circuit Courts, *Report Concerning the Draft of Federal Rules of Attorney Conduct*, at 13

(April 1999) (a "clear rule stating that federal courts will follow and apply the ethical rules of the forum state would provide national uniformity and predictability").

■ Where the Model Rules and the Model Code conflict, deference to the latter is appropriate in New York federal courts since New York remains a Code jurisdiction, and most lawyers must comply with the Code in the bulk of their practice. *Polycast Technology Corp. v. Uniroyal*, 129 F.R.D. 621, 624 (S.D.N.Y. 1990) ("[T]wo decisions by the Second Circuit Court of Appeals indicate that the Code rather than the Model Rules is currently applicable in this Court." (citing *United States v. Hammad*, 846 F.2d 854, 857–58 (2d Cir.1988) and *United States v. Kwang Fu Peng*, 766 F.2d 82, 86 n. 1 (2d Cir.1985))); *Cresswell v. Sullivan & Cromwell*, 704 F.Supp. 392, 400–01 & n. 7 (S.D.N.Y.1989), *aff'd in part, rev'd in part on other grounds*, 922 F.2d 60 (2d Cir. 1990) (deferring to Code over rules and noting that "[t]he New York State Bar Association has never adopted the A.B.A. Model Rules").

The federal district court for the Eastern District of New York requires lawyers appearing before it to comply with the New York Code. *See, e.g.,* S. & E.D.N.Y. Local Civil Rule 1.3 (1997) (as amended) (familiarity with New York State Lawyer's Code of Professional Responsibility is a requirement for admission to practice in the Southern and Eastern Districts); *id.,* Rule 1.4 (violation of New York Code "as interpreted by the United States Supreme Court, the United States Court of Appeals for the Second Circuit, and this court" is grounds for discipline in Southern and Eastern Districts).

B. Validity of the Agreement

■ Philip Morris concedes that the Agreement was enforceable at the time it was executed. Nevertheless, it argues that (1) because the firm represented Em-

pire and National on matters unrelated to the tobacco litigation and because both were no longer clients of the firm by the time it filed its notice of appearance in the New York action, no actual ethical violation exists to support disqualification, and (2) in light of this change in circumstances, the June 4th agreement is no longer enforceable since it contravenes the strong public policy against placing restrictions on a client's right of free choice of an attorney, as embodied in DR 2–108(B) of the New York Code.

■  The Agreement is valid.  It was freely entered into and is clear and unambiguous.  Plaintiffs' promise to forego any attempt to disqualify the firm from appearing in the Chicago and Seattle actions was the inducement for the firm's return promise (approved by its client, Philip Morris) not to appear in the New York action.  Promising to waive a claim or forego the enforcement of a legal right is valid consideration.  *See* E. Allan Farnsworth, *Contracts* §§ 2.3, 2.12 (2d ed.1990).

The firm's notice of appearance violated both the intent and letter of the Agreement.  The argument that the firm did not intend to be bound once the plaintiffs were no longer its clients is contradicted by the Agreement's terms and good sense.  The Agreement contained no provision for changed circumstances or any time limitation.  Moreover, established common–law principles require construction of a contract against the drafter—in this case the firm—in the event of any ambiguity.  *See, e.g., Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 62–63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) (construing ambiguities against the drafter).  A large and sophisticated law firm—one whose services defendant claims are crucial and irreplaceable—is capable of expressing its intent by bargaining for limiting language.

■  Defendant's argument that enforcement of the agreement would violate DR 2–108(B) must also be rejected.  DR 2–108(B) provides that "[i]n connection with the settlement of a controversy or suit, a lawyer shall not enter into an agreement that restricts the right of a lawyer to practice law."  22 NYCRR 1200.13(b).  The rule "is an assurance of the public's right to counsel through the lawyer's right to practice law."  Brian A. Wamble, Case Comment, *Ethics—Spiegel v. Thomas, Mann & Smith: Financial Disincentives in Employment Compensation Agreements,* 23 Mem.St.U.L.Rev. 717, 723 (1993).

The sparse case law interpreting DR 2–108(B) and its ABA analogue, Model Rule 5.6(b), suggests a judicial reluctance to interpret these rules as a bar to restrictive covenants in settlement agreements.  In its only pronouncement on the subject, the New York Court of Appeals—whose interpretations of ethical rules, as noted do not bind the court, but are nonetheless an appropriate source of guidance—has stated: "The type of restriction that violates DR 2–108(B) is one that *completely prohibits* the lawyer from representing clients and thus offends the right of members of the public to select and repose confidence in lawyers of their choice without restriction by providing full availability of legal counsel."  *Cohen v. Lord, Day & Lord,* 75 N.Y.2d 95, 106 n. 2, 550 N.E.2d 410, 416, 551 N.Y.S.2d 157, 163 (1989) (citation and internal quotation marks omitted) (emphasis added).

In a recent New York case, the First Department held that the language of DR 2–108(B) did not bar an attorney's agreement not to "assist or cooperate with any other parties or attorneys in any such action against the settling defendants" involving the same investments as those settled in the suit.  *See Feldman v. Minars,* 230 A.D.2d 356, 357, 658 N.Y.S.2d 614, 615 (1st Dep't 1997).  The only reported federal decision squarely to address Model Rule 5.6(b) found that provisions of a settlement agreement requiring class counsel to advise future claimants against filing certain claims falling short of certain medical criteria did not violate the rule because coun-

sel did not intend these provisions to create a binding obligation on their part to refrain from representing clients who did not meet these criteria but wished to sue the defendant. *See Georgine v. Amchem Products, Inc.,* 157 F.R.D. 246 (E.D.Pa. 1994), *rev'd on other grounds,* 83 F.3d 610 (3d Cir.1996), *aff'd sub nom., Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). *But see* ABA Formal Op. 93–371, 9 Law Man. Prof. Conduct 153 (1993) (Model Rule 5.6(b) bars settlement agreements restricting the right of the plaintiff's lawyer to represent future claimants in actions against the defendant).

The rule against restrictive covenants has been criticized as "an anachronism, illogical and bad policy," particularly in the context of mass torts. Stephen Gillers, *A Rule Without a Reason,* 79–Oct A.B.A.J. 118 (1993); *see also Feldman,* 230 A.D.2d at 360, 658 N.Y.S.2d at 617 (adopting Professor Gillers' view); *cf.* Carrie Menkel-Meadow, *Ethics and the Settlements of Mass Torts: When the Rules Meet the Road,* 80 Cornell L.Rev. 1159, 1200 (1995) (*Georgine* court's interpretation of Rule 5.6(b) effectively created a new intent of counsel standard, illustrating the extent to which ethics rules do not work in the context of class action settlements). What must be guarded against is the danger of a defendant—in what is potentially a mass case—blocking future litigation by buying off the individual plaintiffs' counsel in return for an agreement not to bring future suits on behalf of future clients.

The Agreement, drafted by the firm, is not only less restrictive than those upheld in *Feldman* and *Georgine,* it is different in kind. It does not implicate the concerns which animate DR 2–108(B). It poses no threat to the public's unfettered right to counsel or any danger that the rights of potential future claimants are being bargained away. It concerns only the right of a single defendant, Philip Morris, to be represented by its chosen counsel, the firm, in a single (albeit massive) lawsuit.

The defendant saw fit to freely exchange this right for valuable consideration. Such an agreement resembles a stipulation between parties of the type routinely enforced by the courts in the interests of efficient judicial administration. The scope of matters to which parties may stipulate is broad; "generally, all stipulations made by parties for the government of their conduct, or the control of their rights, in the trial of a cause, or the conduct of a litigation, are enforced by the courts." *Matter of New York, Lackawanna & Western R.R. Co.,* 98 N.Y. 447, 453 (1885).

C. Appearance of Impropriety and Attorney Disqualification

Canon 9 of the New York Code of Professional Responsibility directs lawyers to avoid "even the appearance of professional impropriety." *See also* Model Code of Professional Responsibility EC 9–6 (a lawyer has a duty "to strive to avoid not only professional impropriety but also the appearance of impropriety"); *Emle Indus., Inc. v. Patentex, Inc.,* 478 F.2d 562, 571 (2d Cir.1973) ("Nowhere is Shakespeare's observation that 'there is nothing either good or bad but thinking makes it so,' more apt than in the realm of ethical considerations.").

This injunction against appearances of impropriety gives expression to the paramount importance of preserving the public trust in the legal system and in the judicial process. *See, e.g., General Motors Corp. v. City of New York,* 501 F.2d 639, 649 (2d Cir.1974) ("we must act with scrupulous care to avoid any appearance of impropriety lest it taint both the public and private segments of the legal profession"); *Int'l Business Machines Corp. v. Levin,* 579 F.2d 271, 283 (3d Cir.1978) ("The maintenance of public confidence in the propriety of the conduct of those associated with the administration of justice is so important a consideration that we have held that a court may disqualify an attorney for failing to avoid even the appearance of improprie-

ty."); *U.S. ex rel. Sheldon Elec. Co. v. Blackhawk Heating & Plumbing Co.*, 423 F.Supp. 486, 489 (S.D.N.Y.1976) ("Where doubt may becloud the public's view of the ethics of the legal profession and thus impugn the integrity of the judicial process, it is the responsibility of the court to ensure that the standards of ethics remain high."); *Metro–Goldwyn–Mayer, Inc. v. Tracinda Corp.*, 36 Cal.App.4th 1832, 1838, 43 Cal.Rptr.2d 327, 331 (2d Dist.1995) ("The paramount concern ... must be the preservation of public trust in the scrupulous administration of justice and the integrity of the bar.").

So critical to the effective functioning of the legal system is the public's confidence in its integrity that the appearance of professional impropriety may be as important as the fact of its existence. *See, e.g., In re Yarn Processing Patent Validity Litig.*, 530 F.2d 83, 89 (5th Cir.1976) ("Public perception of [impropriety] will tend to undermine public confidence in the legal profession and the judicial process even if the former client is not in fact damaged."); *State. v. Galati*, 64 N.J. 572, 319 A.2d 220, 223 (1974) ("[I]n matters of ethics and professional probity, the cause and effect impact upon the public consciousness is almost, perhaps quite, as important as the actual fact."). As Justice Frankfurter observed, "justice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 13, 75 S.Ct. 11, 99 L.Ed. 11 (1954).

The appearance of impropriety is of particular concern in today's climate of widespread and entrenched hostility towards the legal profession. Two commentators have recently claimed that the public's view of the legal profession is currently at an all-time low:

> Americans have long regarded lawyers with suspicion and criticism. A hundred and fifty years ago Abraham Lincoln cited a 'vague popular belief that lawyers are necessarily dishonest.' But never in our country's history have lawyers—and how they think, speak, and

act—been as controversial as they are to day. People ask why lawyers so rarely seem to owe allegiance to the truth or basic concepts of justice. Many consider the typical American lawyer to be either immoral or amoral, while many others believe that our justice system no longer protects the interests of the average person. Polls show that public confidence in lawyers has never been lower.

Richard Zitrin & Carol M. Langford, *The Moral Compass of the American Lawyer: Truth, Justice, Power, and Greed* 3 (1999). *See also* Roberta K. Flowers, *What You See Is What You Get: Applying the Appearance of Impropriety Standard to Prosecutors*, 63 Mo.L.Rev. 699, 701 & n. 13 (1998) ("Public perception of the justice system and of lawyers has declined in recent years"); Geoffrey C. Hazard, Jr., *The Future of Legal Ethics*, 100 Yale L.J. 1239, 1240 (1991) ("the public, and perhaps the profession itself, seem increasingly convinced that lawyers are simply a plague on society").

■ Because of the strong countervailing interest in the public's right to unfettered choice of an attorney, the appearance of impropriety is usually insufficient, in and of itself, to support disqualification. A violation of either the duty to preserve client confidences or the duty to exercise independent judgment on the client's behalf is generally also required where disqualification is sought on Canon 9 grounds. *See, e.g., Bd. of Educ. of the City of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979); *Culver v. Merrill Lynch & Co.* 1997 WL 223088, at * 2 (S.D.N.Y.1997); *In re Joint Eastern and Southern District Asbestos Litig.*, 133 F.R.D. 425, 429 (E.D.N.Y.1990); *but see United States v. Hobson*, 672 F.2d 825, 828 (11th Cir.1982) ("Because some conduct that is ethical in fact may be perceived by laypersons as unethical, members of the bar are held by Canon 9 to a standard that prohibits not only actual impropriety, but conduct that may simply appear to be improper.").

■ The Second Circuit concurs in the general aversion to disqualifications. *See, e.g., Stratavest Ltd. v. Rogers,* 903 F.Supp. 663, 666 (S.D.N.Y.1995) ("Motions to disqualify opposing counsel are viewed with disfavor in this Circuit."); *Bennett Silvershein Assocs. v. Furman,* 776 F.Supp. 800, 802 (S.D.N.Y.1991) (same); *Society for Good Will to Retarded Children, Inc. v. Carey,* 466 F.Supp. 722, 724 (E.D.N.Y. 1979) (same). "This reluctance [to disqualify] probably derives from the fact that disqualification has an immediate adverse effect on the client by separating him from counsel of his choice, and that disqualification motions are often interposed for tactical reasons." *Board of Educ. of the City of New York v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir.1979).

Only in rare cases is disqualification for the mere appearance of impropriety desirable. *See, e.g., Nyquist,* 590 F.2d at 1247 ("where there is no claim that the trial will be tainted, appearance of impropriety is simply too slender a reed on which to rest a disqualification order *except in the rarest cases.*") (emphasis added); *Gleason v. Zocco,* 941 F.Supp. 32, 35 (S.D.N.Y.1996) (appearance of impropriety insufficient "except in unusual circumstances"); *Softel v. Dragon Medical & Scientific Communications Ltd.,* 1995 WL 75490 (S.D.N.Y. Feb.23, 1995) (appearance of impropriety *"usually* insufficient to disqualify an attorney" (emphasis added)).

*Rosman v. Shapiro,* 653 F.Supp. 1441 (S.D.N.Y.1987), illustrates such a rare case. It involved an attempt by counsel who had previously represented both parties to represent one side in a dispute between them. Pointing out that the Second Circuit had not ruled out the possibility of disqualification based on appearances alone, the court held:

> Where, as here, the appearance of impropriety is so great, the Court in the exercise of its supervisory powers cannot allow the situation to go uncorrected. The Court also notes that one of the major policy considerations which underlies the Second Circuit's hesitancy to disqualify counsel, to wit, the unnecessary delay and expense created by counsel substitution, is not present in this case because the Court is not disqualifying the of-counsel attorneys. In short, weighing the needs of efficient judicial administration against the necessity of protecting the integrity of the judicial process, the Court concludes that this is one of those rare cases where disqualification is appropriate solely on Canon 9 grounds.

*Rosman,* 653 F.Supp. at 1446 n. 10 (citation omitted).

IV   Application of Law to Facts

■ In the instant case the appearance of impropriety alone would support disqualification even absent an enforceable contract of disqualification. Disqualification would result in no prejudicial delay. Philip Morris is currently ably represented. Moreover, the appearance of impropriety is enhanced here due to the high profile of the case and the fact that it concerns the health care of millions of people.

The possible view of many Blue Cross–Blue Shield subscribers is illustrated by a hypothetical conversation between co-workers, both Blue Cross insureds, over lunch:

> Worker 1: Have you been following that lawsuit Blue Cross is bringing against the tobacco companies?
>
> Worker 2: Yes.
>
> Worker 1: Did you hear what those lawyers did?
>
> Worker 2: No, what?
>
> Worker 1: This law firm that used to work for our Blue Cross actually switched sides! Now it's representing the tobacco companies. Can you believe the judge let those lawyers get away with that one?
>
> Worker 2: What do you expect? No loyalty. Of course the judges don't stop

them! Don't forget, they used to be lawyers too.

Worker 1: Just imagine what would happen to one of us if we tried to work both sides of a picket line.

The health representatives of tens of millions of people are involved in this case, creating a tension between individual justice and mass litigation. Courts must be particularly sensitive to the feelings of lay people about what constitutes justice in these mass cases that are widely discussed.

In small-scale litigation, it is generally possible to explain ethical issues and questions of conflicts of interest to the litigants. In a mass case we lack that opportunity. *See generally* Carrie Menkel–Meadow, *Ethics and the Settlements of Mass Torts: When the Rules Meet the Road,* 80 Cornell L.Rev. 1159 (1995) ("The existing [ethics] rules ... do not really contemplate either the kind of lawyer-client relations that exist in the settlement of mass torts or the kinds of tasks and activities engaged in by the legal actors in these situations."); Essay, *Ethical Dilemmas in Mass Tort Litigation,* 88 Nw.L.Rev. 469 (1994) (discussing need to adapt ethical rules developed in the context of small-scale litigations to mass torts); Stephen Gillers, *A Rule Without a Reason,* 79–Oct. ABAJ 118 (inapplicability of Rule 5.6(b) to mass torts). Particularly in such a highly visible case, where the conduct of the parties and their attorneys is subject to public scrutiny, the need to avoid all appearance of impropriety is acute.

IV.   Conclusion

Winston & Strawn's motion to represent Philip Morris is denied. Plaintiffs' motion to disqualify Winston & Strawn is granted.

So ordered.