**THE EUROPEAN COMMUNITY,**
Plaintiffs,

v.

`RJR NABISCO, INC., et al., Defendants.

**Department of Amazonas,**
et al., Plaintiffs,

v.

**Philip Morris Companies, Inc.,**
et al., Defendants.

No. 00–CV–06617 (NGG).

United States District Court,
E.D. New York.

March 9, 2001.

---

Frank H. Granito, III, John J. Halloran, Jr., Speiser, Krause, Nolan & Granito, New York City, Charles Arthur Acevedo, Krupnick, Campbell, et al., Ft. Lauderdale, NY, for plaintiffs.

GARAUFIS, District Judge.

Now before this court are objections to Magistrate Judge Viktor Pohorelsky's recommendation that Defendants' motion for disqualification of counsel on the grounds of ethical violations be denied in its entirety, and objections to Judge Pohorelsky's denial of several orders seeking discovery of the retainer agreements entered into by Plaintiffs and certain of Plaintiffs' counsel in the above-captioned cases and other information in connection therewith. (Dec. 21, 2000 Tr. 91–99; Order dated Jan. 12, 2001; Order dated Feb. 2, 2001.) For the reasons set forth below, this court adopts the magistrate's recommendation, denies Defendants' motion for disqualification, and affirms his discovery orders.

*I. Procedural and Factual Background*

The above-captioned cases, which are distinct and have been consolidated for administrative purposes, have been brought by numerous political subdivisions of the Republic of Colombia (the "Amazonas Case"), and by the European Community (the "EC Case"), against major global producers of cigarettes. Plaintiffs in the Amazonas Case have sued Philip Morris Companies, Inc. and several of its affiliated corporate entities (the "PM Defendants"), BAT Industries P.L.C. and several of its affiliates, and Brown & Williamson Tobacco Corporation. Plaintiffs in the EC Case have sued Philip Morris Companies, Inc. and several of its affiliates, and several companies related to R.J. Reynolds Tobacco Company. Plaintiffs' claims in both cases are brought under the Racketeer Influenced and Corrupt Practices Act, 18 U.S.C. §§ 1961–68 ("RICO"). The complaints allege, *inter alia,* that these tobacco companies have caused injury to Plaintiffs' economic interests by conspiring to sell cigarettes to distributors knowing that they would ultimately be smuggled into Plaintiffs' respective territories without payment of required taxes and duties. In both cases, Plaintiffs allege numerous violations of RICO and state common law, including, but not limited to, racketeering, money laundering, wire and mail fraud, conspiracy, fraud, public nuisance, unjust enrichment, negligence and negligent misrepresentation.

The subject of disqualification was raised for the first time in this case on October 13, 2000 at oral argument on Philip Morris' motion for a stay of the Amazonas Case and on Plaintiffs' motion to preserve evidence. At the outset of that hearing Irvin Nathan, counsel for the PM Defendants, stated that he considered it his obligation to raise, before addressing the issues scheduled to be discussed on that date and with less than one day's notice to Plaintiffs' counsel and without any notice to the court, "serious questions" pertaining to the retainer agreement between the Department of Boyaca, which is one of the Departments [1] of the

---

1. "A department of the Republic of Colombia is an autonomous legal entity with rights and responsibilities similar to a state of the United States.... Each has an executive branch

Republic of Colombia which have brought suit against the tobacco companies, and Plaintiffs' counsel (the "Boyaca Retainer")[2]. (Oct. 13, 2000 Tr. 8.) Noting that such agreements "are filed publicly in Colombia, apparently under Colombian law,"[3] (*Id.*), counsel asserted that the Boyaca Retainer "ha[s] a number of peculiar provisions which are inconsistent and in violation of the Canons of Ethics that are governing in New York, applicable in the Eastern District of New York and also in

headed by a democratically elected governor and each has its own legislature. Each department has the right to levy certain taxes and has the duty to maintain the health, education, and safety of its citizens by way of providing schools, hospitals, medical ... and other services." (Carrizosa Aff. ¶ 2, submitted as Exh. A to Pls.' Mem. in Opp. to Philip Morris' Mot. for Stay.)

2. The Department of Boyaca signed the Boyaca Retainer on October 1, 1999 with two of the law firms representing Plaintiffs in the above-captioned cases, namely Sacks and Smith, L.L.C., and Krupnick, Campbell, Malone, Roselli, Buser, Slama, Hancock, McNelis, Liberman & McKee, P.A. On the same day, the Department of Boyaca signed a separate agreement (the "BERG Agreement") with Business Exposure Reduction Group L.L.C. ("BERG"). (*See* Defs.' Mem. in Supp. of Mot. to Disqualify 9, Stewart Decl. dated Nov. 8, 2000 Exhs. 1, 2.) The third law firm representing Plaintiffs in the consolidated cases, namely Speiser, Krause, Nolan & Granito, is not a signatory to either the Boyaca Retainer or the BERG Agreement.

3. Defendants represent that "[t]he agreements are matters of public record in Colombia and ... provide on their face that they may be filed in the court where the actions are brought and may be interpreted and applied by that court." (Mem. in Supp. of Mot. to Disqualify 9–10.) Defendants further note that at the time their motion was filed, they "d[id] not have all of the agreements but reasonably believe[d] that all are substantially similar to the Boyaca agreement." (*Id.* 10 n. 5.)

Exactly when the Defendants became aware that certain provisions of the Boyaca Retainer could be challenged on ethical grounds is controverted, as is the amount of lead time Defendants' counsel may have had prior to raising issues concerning the retainer with this court. Counsel for Defendants avers that "[i]n early October, 2000, counsel for Philip Morris received a copy of a contingen-cy fee agreement in Spanish—and an English translation—between the Department of Boyaca and Plaintiffs' counsel dated October 1, 1999.... At the same time, counsel for Philip Morris also received a copy of a contingency fee agreement in Spanish—and an English translation—between the Department of Boyaca and Business Exposure Reduction Group LLC dated October 1, 1999." (Stewart Decl. dated Nov. 8, 2000 ¶¶ 2,3.) Plaintiffs' counsel, on the other hand, notes that the copy of the Boyaca Retainer submitted in connection with the motion to disqualify differs from the copy submitted to the court on October 20, 2000, in that the latter includes unredacted telecopier notations indicating that British American Tobacco (Investments) Limited ("BAT") sent the retainer to its counsel, Cravath, Swaine & Moore, on April 14, 2000, nearly six months prior to the date on which Mr. Nathan first brought the Boyaca Retainer to the attention of this court. (Pls.' Mem. in Opp. to Mot. to Disqualify 25.) Defendants dismiss as "ridiculous" the suggestion that BAT tactically delayed advising the court with respect to ethical issues, but do not deny that BAT was in possession of a copy of the retainer as early as April, 2000. (Defs.' Reply Mem. in Supp. of Mot. to Disqualify 34 n. 19.) Without suggesting wrongdoing on the part of counsel for any party, it is at least arguable that if, as seems likely, counsel for BAT possessed a copy of the Boyaca Retainer several months in advance of the October 13, 2000 oral argument, counsel for Philip Morris would have been under an obligation to enlarge upon his statement that the purported ethical violations were raised "at the earliest time that this issue [wa]s known to us." (October 13, 2000 Tr. 7.) The court notes that counsel for BAT was present at the October 13, 2000 hearing, even though BAT had not yet been served, and did not see fit at that time to explain the basis of BAT's decision to assist the PM Defendants by bringing the Boyaca Retainer to their attention. Suffice it to say that counsel for all parties are strongly cautioned against resorting to gamesmanship.

violation of the New York State Statute against Champerty." (*Id.* 7–8.) Because both Plaintiffs and this court effectively lacked notice of Defendants' intention to raise alleged ethical violations arising from the Boyaca Retainer, the matter was adjourned pending further correspondence between the parties and deliberation by the court.

Further correspondence between counsel made clear that Defendants would move to disqualify Plaintiffs' attorneys. Thus, on November 1, 2000, I ordered an expedited briefing schedule for the impending motion. The parties were instructed to address the following points, in addition to any other arguments they might have seen fit to make: (1) why the ethical violations alleged in the PM Defendants' letters to Plaintiffs' counsel and to this court should or should not be raised before the Committee on Grievances, as set forth in the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York; and (2) the applicability to this motion of the standard, adopted by the Second Circuit, calling for disqualification of counsel "only upon a finding that the presence of a particular counsel will taint the trial by affecting his or her presentation of a case." *See Bottaro v. Hatton Assocs.*, 680 F.2d 895, 896 (2d Cir.1982). (Order dated Nov. 1, 2000 at 1.)

Defendants' motion, styled a "motion to disqualify counsel and dismiss complaints for prejudicial ethical violations by Plaintiffs' attorneys," was fully briefed and submitted as of November 22, 2000. I referred the motion shortly thereafter, at a status conference on November 27, 2000, to Magistrate Judge Pohorelsky for a report and recommendation. In connection with the referral, counsel for Defendants sought an order directing Plaintiffs to submit a copy of the retainer agreement between Plaintiffs and their counsel in the EC Case to Judge Pohorelsky for *in camera* review, in order to determine whether or not the ethical issues raised in connection with the Amazonas Case were likely to arise in the EC Case also. (Nov. 27, 2000 Tr. 23.) I referred this request to the magistrate as well. (*Id.* 24.)

In their motion papers, Defendants attacked numerous provisions of the Boyaca Retainer, as well as the BERG Agreement. In general terms, Defendants complained that three aspects of these agreements present ethical problems: (1) provisions of the Boyaca Retainer describing the nature and scope of the attorneys' financial responsibilities; (2) provisions of the Boyaca Retainer describing the degree of control to be exercised by the attorneys over the litigation; and (3) the contingent fee described in the BERG Agreement and its relation to the Boyaca Retainer. In particular, Defendants argued that the following characteristics of the agreements at issue offend the ethical rules governing the conduct of attorneys practicing in this district:

1. The costs covered by the Attorneys encompass all costs and expenses of litigation, including the costs of an investigation firm which had been hired and the fees of additional attorneys.

2. The client bears no responsibility to repay the expenses assumed by counsel unless there is a recovery in the lawsuit, in which case the expenses will be paid from the recovery.

3. The attorneys guarantee payment of other expenses that may arise in connection with the litigation against the tobacco companies, including any court order to pay Defendants' attorneys' fees and costs, and any judgment in a counterclaim brought

against the client for defamation, libel or slander or for the abuse of the right to sue, and the costs of defending such a counterclaim.

4. BERG is to receive from the client a contingency fee of three percent, and its expenses during the pendency of this litigation are to be paid by the attorneys.

5. The client is required to maintain the confidentiality of information provided by the attorneys, which is designated as the property of the attorneys. .

6. The client cedes to the attorneys control over certain aspects of the strategy to be implemented in conducting this and other, related litigation, grants the attorneys the right to withdraw in the event that the client fails to cooperate substantially with the attorneys in prosecuting the action, and agrees not to interfere with the attorneys' defense of any counterclaim brought against the client in connection with this case.

On December 21, 2000 Magistrate Judge Pohorelsky recommended, from the bench, that Defendants' motion be denied in its entirety. Rejecting Defendants' argument that the standard articulated by the Second Circuit in the *Bottaro* line of cases had been relaxed to, in effect, require a lesser showing to support disqualification, the magistrate succinctly stated the analysis to be applied to Defendants' motion: "the question before this Court is not whether ethical violations have occurred. The question is whether any ethical violations that may have occurred because of the particular attorneys' representation of the particular clients here are of [such] a character that they taint the trial process." (Dec. 21, 2000 Tr. 92.) Noting that Defendants' allegations of ethical misconduct did

not bring this case within either of the categories of cases in which the Second Circuit, "with rare exceptions," has ordered disqualification, *see Board of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979), and specifically rejecting the contention that the institution of a lawsuit constitutes prejudice to an adversary, *Ceramco, Inc. v. Lee Pharmaceuticals* , 510 F.2d 268, 271 (2d Cir.1975), Magistrate Judge Pohorelsky proceeded to assess each of the alleged ethical violations in light of the "taint" standard espoused by the Second Circuit. In each instance, the magistrate concluded that application of controlling caselaw did not support granting the relief sought.

Prior to the magistrate's issuance of his recommendation, Defendants renewed their request seeking disclosure of the retainer agreement in the EC Case, (Dec. 21, 2000 Tr. 6.), and also sought limited discovery regarding the relationship between the Plaintiffs and counsel in both cases. (*Id.* 82–88.) The magistrate denied these requests, except for one, ordering submission of the retainer agreement in the EC Case for *in camera* review. (*Id.* 99–102.) Upon review of the EC retainer agreement "under the same analysis employed by the court in its earlier ruling regarding the disqualification motion made in this case," the magistrate found no basis for either disclosure of the EC retainer or for the court to take further action regarding the representation of plaintiff in the EC case. (Order dated Jan. 12, 2001 at 1–2.) The Judge further ordered submission of the remaining retainer agreements entered into between counsel and the various Departments of Colombia in the Amazonas Case for *in camera* review. (*Id.*) Upon review of those agreements, again under the same analysis undertaken in connection with his earlier recommendation, the magistrate found no basis for disclosure or

any further action by the court with respect to the retainer agreement in the EC Case. (Order dated Feb. 2, 2001 at 1–2.)

## II. Discussion

Defendants filed objections to the magistrate's recommendation that the motion to disqualify be denied in its entirety and to the magistrate's denial of Defendants' application for limited discovery of the retainer agreements. I have carefully reviewed all of the parties' skillfully prepared and exhaustive submissions,[4] and have undertaken substantial independent research of the issues raised on this motion. For the following reasons, this court adopts the magistrate's recommendation without modification, and denies the motions to disqualify and for discovery.

### A. Standards of Review

■ Under the Federal Rules of Civil Procedure a district court may reverse a magistrate judge's decision on a non-dispositive matter only if that decision is "clearly erroneous or contrary to law." FED. R. CIV. P. 72(a). Dispositive rulings, however, are reviewed by the district court de novo. See id. 72(b) (referring to dispositive motions as those "dispositive of a claim or defense of a party"). The motion to disqualify Plaintiffs' counsel in the

Amazonas Case was not referred to the magistrate for decision, but rather "for a report and recommendation." (Nov. 27, 2000 Tr. 23.) Thus, Rule 72 does not provide the applicable standard of review. Where, as here, a district court refers a non-dispositive pretrial motion for report and recommendation, the magistrate's conclusions of fact and law are reviewed de novo. See, e.g., Delco Wire & Cable, Inc. v. Weinberger, 109 F.R.D. 680, 685 (E.D.Pa.1986) (concluding that district courts retain discretion to refer non-dispositive pretrial matters for report and recommendation and to consider objections filed thereto); Howe Inv., Ltd. v. Perez Y Cia. de Puerto Rico, Inc., 96 F.Supp.2d 106, 113 (D.P.R.2000) (citing 12 Charles Alan Wright, Arthur R. Miller, Richard L. Marcus, Federal Practice and Procedure § 3069, at 355–56 (2d ed.1997)).[5] The more deferential "clearly erroneous or contrary to law" standard applies, however, to the magistrate's denial of Defendants' motions for limited discovery and for disclosure of the retainer agreements.

### B. Defendants' Objections to the Magistrate's Recommendation

Defendants interpret Second Circuit precedent as requiring trial courts to remedy any ethical violations which are "more

---

4. In connection with the Order dated January 12, 2001, the magistrate neither read nor unsealed the accompanying memorandum submitted by the Plaintiffs with their disclosure of the retainer agreements in the EC Case. (See Order dated Jan. 12, 2001.) I see no reason to conclude differently from the magistrate with respect to the disclosure of this document, production of which the Defendants seek. Consequently, the memorandum remains under seal.

5. Had I instead referred the motion for decision, the magistrate's determination would have been entitled to the more deferential standard of Rule 72(a), because motions for disqualification of counsel are non-disposi-

tive. See Weeks Marine, Inc. v. Raymond International Builders, Inc., 174 F.R.D. 301, 303 (S.D.N.Y.1997) ("Motions for disqualification of counsel are non-dispositive and are thus subject to the more deferential standard under Rule 72(a)."); United States v. Archeval-Vega, 883 F.Supp. 904, 906 (W.D.N.Y.1994) (reviewing magistrate judge's decision to disqualify counsel under "clearly erroneous" standard); Chichilnisky v. Trustees of Colombia Univ., No. 91 Civ. 4617(MJL), 1993 WL 403972, at *9 (S.D.N.Y. Oct.7, 1993) (same); Ab v. Kamyr, Inc., No. 91 Civ. 0453, 1991 WL 246465, at *1 (N.D.N.Y. Nov.20, 1991) (same).

than of a technical nature or simply a matter of appearances." (Defs.' Objections to Magistrate's Recommendation 8) (citing *Gentner v. Shulman,* 55 F.3d 87, 89 (2d Cir.1995).) This formulation overstates the obligations of district courts in this circuit.

■ Whether or not disqualification is warranted is a decision left to the sound discretion of the trial court. *See, e.g., Cresswell v. Sullivan & Cromwell,* 922 F.2d 60, 72 (2d Cir.1990) ("The disqualification of an attorney in order to forestall violation of ethical principles is a matter committed to the sound discretion of the trial court."); *Blue Cross and Blue Shield of New Jersey v. Philip Morris, Inc.,* 53 F.Supp.2d 338, 342 (E.D.N.Y.1999) (citing cases).

■ Motions for disqualification require a delicate balancing of interests. Ensuring that court proceedings are conducted with the utmost integrity and that counsel act in accordance with the highest standards of professional ethics must be weighed against judicial economy and a party's right to retain counsel of its own choosing. The Second Circuit has clearly articulated the standard district courts must apply in balancing these interests. That standard, while recognizing the need to check certain egregious forms of misconduct, promotes the aim of judicial economy by leaving less serious allegations of ethical impropriety to the "federal and state comprehensive disciplinary machinery." *Nyquist,* 590 F.2d.at 1246.

■ Defendants' objection that Magistrate Pohorelsky misstated and misapplied the appropriate standard to the motion for disqualification is unpersuasive. In accordance with my instruction, (*see* Order dated Nov. 1, 2000 at 2.), the magistrate applied the Second Circuit's "restrained approach" to disqualification of attorneys, under which disqualification is not appropriate except "upon a finding that the presence of a particular counsel will taint the trial by affecting his or her presentation of a case." · *Bottaro,* 680 F.2d at 896 (citing *Nyquist,* 590 F.2d at 1246); *see also Softel, Inc. v. Dragon Med. & Scientific Communications Ltd.,* No. 87 Civ. 0167(MGC), 1995 WL 75490, at *2 (S.D.N.Y. Feb.23, 1995); *Rosewood Apartments Corp. v. Perpignano,* No. 99 Civ. 4226(NRB)(MHD), 2000 WL 145982, at *7 (S.D.N.Y. February 7, 2000). An attorney's conduct may "taint the underlying trial" when a conflict of interest or the use of privileged information obtained in a prior representation "disturb[s] the balance of the presentations" in the case. *Nyquist,* 590 F.2d at 1246 (internal quotations and citations omitted).

Of course, "this test will not 'correct all possible ethical conflicts.'" *Id.* (citing *Armstrong v. McAlpin,* 625 F.2d 433, 445 (2d Cir.1980) (en banc), *vacated on other grounds,* 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981)); *see also Peacock Holdings, Inc. v. Massachusetts Mut. Life Ins. Co.,* No. 94 CV 5023(EHN), 1996 WL 480813, *2 (E.D.N.Y. Aug.8, 1996). Trial courts in this circuit have been cautioned against disqualifying counsel except where "necessary to preserve the integrity of the adversary process," *Nyquist,* 590 F.2d at 1246, not least of all because attending to the many allegations raised in the trial courts of ethical infractions that do not rise to the level of "taint" would consume disproportionate judicial resources.[6] *W.T.*

---

6. This case well illustrates the disadvantages of a more aggressive approach to policing attorney misconduct by the trial court. If intervention in response to all allegations of ethical impropriety were required, prior to hearing this motion I would have been obligated to conduct numerous investigations into such matters, none of which go to the merits

*Grant Co. v. Haines*, 531 F.2d 671, 677 (2d Cir.1976) ("the possibilities of endless disputes at the inception of lawsuits on the basis of allegations of professional misconduct cannot be overlooked by the court. The canons of ethics are properly comprehensive and the heat of litigation easily provokes claims of misconduct.").

Zealous trial court intervention in such matters is limited by the increase in tactical motions it would likely promote. Although the objective of apprehending all violations, regardless of their severity, is a "laudable goal," it is unattainable "without inviting the wholesale filing of motions for tactical reasons. The result would be needless disruption and delay of litigation, thereby impairing the efficient administration of justice." [7] *Bottaro*, 680 F.2d at 896. Finally, "[t]he business of the court is to dispose of litigation and not to act as a general overseer of the ethics of those who practice here unless the questioned behavior taints the trial of the cause before it." *Haines*, 531 F.2d at 677.

Unless the "taint" threshold has been crossed, precedent counsels reliance upon alternative institutional mechanisms for assessing the ethical propriety *vel non* of particular instances of questionable attorney conduct. *See Bottaro*, 680 F.2d at 896 ("Where a threat of tainting the trial does not exist, therefore, the litigation should proceed, the remedy for unethical conduct lying in the disciplinary machinery of the state and federal bar."); *Nyquist*, 590 F.2d at 1246 ("Given the availability of both federal and state comprehensive disciplinary machinery ... there is usually no need to deal with all other kinds of ethical violations in the very litigation in which they surface.") (citing *Lefrak v. Arabian American Oil Co.*, 527 F.2d 1136 (2d Cir.1975), *Ceramco*, and *U.S. v. Pastore*, 537 F.2d 675 (2d Cir.1976)). Such fora are uniquely well-suited to address the full range of close ethical questions that arise in connection with attorney conduct that tests the often poorly demarcated boundary between ethically acceptable behavior and proscribed misdeeds. *See McAlpin*, 625 F.2d at 446 (stating that "we continue to believe that possible ethical conflicts surfacing during a litigation are generally better addressed by the comprehensive disciplinary machinery of the state and federal bar"). To ignore the special competence of such bodies in favor of conducting extensive and time consuming satellite ethical inquiries would represent a departure from the obviously wiser course. *See, e.g.,* Multiform Federal Practice: Ethics and Erie, 9 Geo. J. Legal Ethics 89, 131 (recommending further separation of dispute resolution and disciplinary functions in the

---

of an already very complicated dispute. (*See, e.g.,* Carrizosa Aff., submitted as Exh. A to Pls.' Mem. in Opp. to Philip Morris' Mot. for Stay (alleging destruction of documents by PM Defendants and that representatives of tobacco companies have initiated impermissible contacts with Plaintiffs); Pls.' Mem. in Supp. of Mot. to Preserve Evidence (alleging concealment of documents by BAT); Pls.' Mem. in Opp. to Mot. for Disqualification 26 n. 11 (repeating allegation raised in Second Amended Complaint that BAT had plan to undertake destruction of documents).)

7. In this regard, the disqualification standard adopted by the Second Circuit stands in pronounced contrast to the standard adopted in certain other jurisdictions. In place of the "taint" standard, which it has described as a "hands-off approach" and "a more relaxed ethical rule," the Fifth Circuit, for example, has chosen a rule which, because it requires "careful and exacting application of the rules in each case [to] separate proper and improper disqualification motions," *In re American Airlines, Inc.*, 972 F.2d 605, 611 (5th Cir. 1992), imposes a far greater burden on the district courts to police the full range of ethical violations, without any particular sensitivity to whether or not such breaches actually threaten the integrity of the judicial process.

federal courts); *Papanicolaou v. Chase Manhattan Bank, N.A.*, 720 F.Supp. 1080, 1082 (S.D.N.Y.1989) ("courts exist to resolve disputes, not to discipline lawyers who come before them"); *Metromedia Co. v. Fugazy*, No. 87 CIV. 2597(RCL), 1988 WL 140773, at *4 (S.D.N.Y. Dec.23, 1988) ("The court's role in deciding [a disqualification motion] is not disciplinary. It is to determine whether continued representation will taint the judicial process.").

As Magistrate Judge Pohorelsky pointed out, the Second Circuit has identified only two situations wherein ethical violations have been found with any frequency to have tainted the proceedings:

> [w]ith rare exceptions, disqualification has been ordered only in essentially two kinds of cases: one, where an attorney's conflict of interest in violations of Canons Five and Nine of the Code of Professional Responsibility undermines the court's confidence in the vigor of the attorney's representation of its client. Or, more commonly, two, where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation, for example in violation of Canons Four and Nine, thus giving his present client an unfair advantage.

(Dec. 21, 2000 Tr. 92 (citing *Nyquist*, 590 F.2d at 1246).)

A court confronted with ethical violations falling into neither of these categories of cases need not resolve them absent a clear showing that the balance of presentations has been disturbed. *Nyquist*, 590 F.2d at 1246. In fact, the Second Circuit has held that it is reversible error for a district court to disqualify counsel for ethical violations which do not rise to the level of "taint," even though "the question whether [the attorney's] conduct is unethical could be a very close one." *Id.* at 1247.

Under this precedent, the only question properly before a court on a motion to disqualify is whether the representation of a party by its freely-chosen attorneys would "taint" the trial. "Precisely which facts will taint the trial is a question that is best considered in the context of the particular facts presented by each case." *United States Football League v. National Football League*, 605 F.Supp. 1448, 1464 (S.D.N.Y.1985). In the absence of a showing of "taint," this court will not engage in a protracted investigation and analysis into satellite issues which are better raised in alternative fora designed expressly for their resolution.

■ The required showing of taint has not been met in this case. Defendants' counsel conceded, at a minimum, that this case does not involve issues of prior representation or misuse of privileged information. (Dec. 21, 2000 Tr. 16–17; Defs.' Objections to Magistrate's Recommendation 17 n. 8.) Defendants contend, rather, that the retainer agreement embodies a potential conflict of interest. At oral argument before the magistrate, counsel for BAT sought to illustrate the alleged conflict arising out of the indemnification provisions by means of the following hypothetical:

> Mr. Rolfe: ... Six months, a year down the road, let's assume that the judge incorrectly decides not to dismiss this case and there's a settlement offer put on the table and it's a very low settlement offer, but it says to the lawyers, gentlemen, we are prepared to drop our lawsuit in Colombia if you accept our settlement offer. The lawyers may very well think this is a real good deal here because we get out from under the problem in Colombia.
>
> Contrariwise, there is a big offer but it doesn't let the lawyers out of the suit in Colombia and the lawyers say to their

clients, this is not a good enough offer. You've got to get out from under the suit in Colombia. The reason that that's a problem is because there's a conflict. There's a direct conflict between the interests of the lawyer and the interests of the client. That exists right now. That doesn't just exist if a suit is brought. That exists right now.

The Court: Can you explain that to me? Why does it exist right now?

Mr. Rolfe: Because you can't wait six months and say, when the process of this case has run its course, now that you've brought a lawsuit, there's a client. I'd file tomorrow. Then they'd be put in a problem.

The Court: That may be so but it hasn't happened yet. Maybe you need to go file that lawsuit.

(December 21, 2000 Tr. 50–51; *see also* Defs.' Reply Mem. in Supp. of Mot. to Disqualify 30.)

The magistrate's pointed remarks illustrate the weakness of Defendants' argument that the retainer agreement, by its terms, gives rise to an unavoidable conflict of interest which taints the proceedings and requires the drastic remedy of disqualifying Plaintiffs' chosen counsel. Even crediting the contention that the agreement to indemnify the Plaintiffs in the event of a suit or counterclaim against them for libel, slander or abuse of the right to sue could generate a conflict at some point in the future, this hypothetical possibility does not threaten the integrity of the judicial process. Plaintiffs' submissions indicate that the clients affirmatively sought this particular agreement. (Ruano Aff. ¶ 9, submitted as Exh. C to Pls.' Mem. in Opp. to Mot. Disqualify.) Its consequences, including the remote possibility that counsel would be faced with circumstances in which it might be tempted to place self-interest above scrupulous profes-

sionalism, were well within the competence of both the individual Departments of Colombia and the Colombia Federation of Departments to foresee. (*See id.* (indicating that negotiation of retainer agreements entailed coordinated discussions at both departmental and federation levels, with assistance from internal and external federation counsel).) The record is devoid of any indication that the indemnification provision was the product of a disparity in either sophistication or bargaining power. In the absence of any evidence of overreaching or improper conduct on the attorneys' part, it would be inappropriate for this court to adjust the terms of the bargained-for agreement.

There is also no concrete indication that counsel is impermissibly conflicted at present. Suit has not been filed against the Plaintiffs for slander or abuse of process. Until such a suit is filed, the indemnification provision remains inoperative. It is far from clear, in fact, that grounds for such a suit now exist, or that such a suit can be brought against Plaintiffs in Colombia for filing a civil lawsuit in the United States. (*See* Dec. 21, 2000 Tr. 68; *cf.* Vallejo Decl. dated Nov. 27, 2000 ¶ 6.) Furthermore, even in the event of a countersuit that would render the provision operative, there is no basis for concluding that Plaintiffs' counsel would place its own interests above those of its clients, even in the face of a strong temptation to do so. At worst, under the hypothetical circumstances described by counsel for BAT, the provision at issue might give rise to an "appearance of impropriety." Standing alone, however, appearances of impropriety are "simply too slender a reed on which to rest a disqualification order except in the rarest cases." *Nyquist*, 590 F.2d at 1247 (finding no risk of taint and declining to disqualify counsel under "appearance of impropriety" standard of Canon 9 where

attorney compensated in part by portion of union dues contributed by opposing parties); *Brown v. City of Oneonta,* 203 F.3d 153, 155 (2d Cir.1999) (disqualification unwarranted absent "demonstrable evidence" that appellants' attorney's representation of appellant was "adversely affected" by his interest in obtaining employment with adversary, with whom he had interviewed on at least three occasions in two months prior to oral argument); *Blue Cross and Blue Shield of New Jersey,* 53 F.Supp.2d at 346 ("Only in rare cases is disqualification for the mere appearance of impropriety desirable."). Because no reading of the indemnification provision convinces this court that it presents the possibility of taint, it cannot serve as a basis for disqualification.

In *Softel, Inc. v. Dragon Medical and Scientific Communications Ltd.,* No. 87 Civ. 0167(MGC), 1995 WL 75490, at *32 (S.D.N.Y. Feb.23, 1995), plaintiffs, before proceeding to a trial of damages in a copyright and trademark infringement case, sought to disqualify defendants' counsel because he was representing both defendants and their insurer, whose interests were · adverse with respect to damages. Plaintiff's concern arose from the fact that the insurer had reserved the right to deny coverage for punitive damages, so that defendants would naturally desire as much of the award as possible to be characterized as compensatory damages, while the insurer would desire that as much as possible be characterized as punitive damages. Noting the clients' consent to the representation notwithstanding the potential conflict, the court rejected plaintiff's argument that

defense counsel should be disqualified under DR 5–105 of the New York Code of Professional Responsibility. The court concluded that "[p]laintiff has not shown that the potential conflict is great enough to taint the trial of damages," *id.* at *4, reasoning as follows:

> It is in the interest of both the insurer and the insureds to minimize the amount of plaintiff's lost profits as well as the amount of profits earned by defendants for their misconduct. Although it is possible that a situation will arise in which defendants' counsel must argue about how to characterize damages, it is not inevitable that such a conflict will present itself during the trial. Therefore, defendants should be allowed to proceed with their chosen counsel.

*Id.*

As in *Softel,* it is far from inevitable that a conflict such as the one hypothesized by counsel for BAT will ever occur, even in the event that Defendants file suit against Plaintiffs in Colombia, as they have suggested they might. Notwithstanding counsel's assertions to the contrary, even if Defendants were to file such a suit, the hypothetical conflict would not emerge unless the suit were meritorious and likely to expose Plaintiffs to substantial liability. Such a conflict would be, moreover, different in character from the one in *Softel* in which counsel could in theory encounter circumstances wherein he would be compelled, of necessity, to place the interests of one client above another's. The likelihood of any such conflict emerging in this case is decidedly remote.[8]

8. In response to the magistrate's inquiries concerning whether or not the indemnification clauses in the retainer agreement amounted to champertous inducement, counsel for Plaintiffs noted:

> Number one, you can't commit champerty with a client you already have, who has

already said, file the lawsuit. Number two, there really never was any risk of this claim being made.... They can't sue us for libel or slander because we file a lawsuit.... Let me explain something else, your Honor. This statute that [counsel for Defendants] say allows a suit that my clients were so

In the absence of either a conflict that threatens the integrity of the proceedings before this court or any precedent in this circuit concluding that disqualification was warranted in connection with a similar provision of a fee agreement, this court declines to engage in a novel line-drawing exercise with the effect of redrafting a consensual retainer agreement entered into between U.S. counsel and foreign governmental entities in civil litigation on this scale.

Aside from the indemnification provision, Defendants point to no other features of the Boyaca Retainer or any of the other retainer agreements that suggest a dis-

qualifying conflict of interest. As the magistrate noted, several of the provisions of the Boyaca Retainer certainly "raise questions about whether they violate ethical rules." (Dec. 21, 2000 Tr. 94.) Nevertheless, even assuming they transgress ethical boundaries, the caselaw does not support the proposition that the components of the retainer agreement complained of here, including the allegedly champertous indemnification provisions and the separate contingency arrangement between the Departments and BERG, "taint" the judicial process.[9] In the absence of a substantial threat to the integrity of that process, this court declines to

---

afraid of—the maximum claim under that kind of a suit is 1,000 grams of gold, which is basically $10,000. The maximum attorney's fee is 5% of the recovery. (Dec. 21, 2000 Tr. 69.)

Defendants did not contest this assertion either at oral argument or in their briefing papers. While the characterization of Colombian law on this point by Plaintiffs' counsel is hardly dispositive, because it was not controverted, and because, as noted *supra*, Plaintiffs individually and acting under the auspices of the Federation of Governors sought out this component of the fee contract, there is little reason to dispute counsel's assertion that the sums at issue in the event of a countersuit for libel, slander, or abuse of process under Colombian law are trivial in comparison to the recovery sought in the Amazonas Case. Thus, it is even less likely that any potential conflict would give rise to taint.

9. Defendants insist that "courts repeatedly have disqualified counsel for violations of Canon 5's rule against a lawyer acquiring an interest in the litigation." (Defs.' Reply Mem in Supp. of Mot. to Disqualify 29.) The Second Circuit has never so held. The language cited by Defendants in *Fleischer v. Phillips,* 264 F.2d 515, 516 (2d Cir.1959) not only is dicta, but predates the clear formulation of the "taint" standard by the Second Circuit. The court in *Peggy Walz, Inc. v. Liz Wain, Inc.,* No. 94 Civ. 1579(CSH), 1996 WL 88556, at *1 (S.D.N.Y. Mar.1, 1996) held that disqualification was required based upon its conclusion that the plaintiff and her counsel were cosignatories to an incorporation agreement

that "confer[red] upon [counsel] a substantial, explicit and direct proprietary interest in the plaintiffs' causes of action against defendants and in the copyrighted designs that form the subject matter of the action." No such relationship exists here; it simply cannot be asserted with any degree of plausibility that counsel have any meaningful input concerning, nor any meaningful proprietary interest in, the conduct of their clients' business, which is to say, in the governance of the Departments of Colombia. It should be noted, moreover, that the court in *Peggy Walz* did not explicitly analyze the conduct at issue in terms of the Second Circuit's "taint" standard. Although the court in *Norma Brothers v. Earl's Fashions, Inc.,* No. 83 Civ. 3767(JFK), 1984 WL 166, at *2 (S.D.N.Y. April 12, 1984) did undertake such an analysis, it is nevertheless inapposite. In *Norma Brothers,* as in *Peggy Walz,* the attorney's pecuniary interest was coterminous with the subject matter of the suit, because he was the assignee of the accounts at issue in the action. Moreover, the primary ground on the basis of which disqualification was ordered in *Norma Brothers* was that counsel was the only witness available to testify to a material issue in the case. To the limited extent that these and other New York State cases cited by Defendants in this connection are apposite, none addresses a factual situation that is sufficiently analogous to guide this court in deciding this motion, and none controls the outcome of this motion.

resort to the severe penalty sought by Defendants' motion.

## C. Review of Magistrate's Denial of Discovery

Defendants object that although the magistrate "revealed serious concerns about the provisions in the retainer agreements," he nevertheless declined "to get involved in a detailed review of those matters," and that this response was inconsistent with Second Circuit precedent, in particular *Gentner v. Shulman,* 55 F.3d 87 (1995). (Defs.' Objections to Magistrate's Recommendation 10.) The *Gentner* decision has no bearing on the standard to be applied when assessing whether or not disqualification is warranted, and does not speak to whether or not a district court is obligated to conduct an evidentiary hearing in connection with such allegations of attorney misconduct.

■ The quantum of discovery required in connection with such a motion is left to the discretion of the trial judge. In *Lefrak v. Arabian American Oil Co.,* 527 F.2d 1136 (2d Cir.1975), defendants in three non-class antitrust actions then pending in this District moved to disqualify plaintiffs' counsel. The motion was based on documents suggesting "on their face" the improper solicitation of clients through non-lawyers, in violation of N.Y. Jud. L. § 479 and DR 2–103(C), (D) and (E) and DR 2–104(A)(1) of the Code of Professional Responsibility. *Id.* at 1137. Having concluded that the documents at issue warranted further scrutiny, the district court judge in *Lefrak* conducted a hearing at which, as in the proceedings before Magistrate Judge Pohorelsky in this case, counsel for the parties seeking disqualification insisted upon his right to interrogate witnesses in connection with the motion. The trial judge disagreed, noting that the hearing was a "judicial" rather than an "adver-

sary" proceeding, and denied both counsel's request to expand the evidentiary hearing and, ultimately, the motion to disqualify counsel. Defendants appealed, seeking to have the trial judge's order vacated and remanded for further hearings "with instructions for a full and vigorous investigation of the underlying facts." *Id.* at 1140. The Second Circuit agreed with the lower court that disqualification proceedings are judicial in character, approving long standing precedent to the effect that "[t]he manner in which [such] proceeding is conducted, so that it be without oppression or unfairness, is a matter of judicial regulation." *Id.* (citing *Randall v. Brigham,* 74 U.S. (7 Wall.) 523, 540, 19 L.Ed. 285 (Dec. Term 1868)). The court in *Lefrak* concluded as follows:

> Certainly the method of conducting the inquiry is within the discretion of the judge charged with the responsibility of supervision. This court has not mandated any procedure. The trial judge may be able to make the determination of impropriety vel non on the basis of oral arguments and affidavits ... he may appoint a special master to ascertain the facts ... or he may conduct the evidentiary hearing which was provided here.... Whether discovery is permissible is clearly within his discretion in any event ... and that discretion should be rarely disturbed in a non-adversary proceeding involving attorney disqualification.

*Id.* The court found that counsel for the defendants, by bringing the alleged violations to the court's attention, and the trial judge, by ensuring that the infractions complained of did not taint the cases pending before him, had satisfied their respective professional obligations. Noting that "[t]o conduct the broad investigation sought here, aside from its irrelevancy to the remedy of disqualification, in effect

transforms the trial judge into the Grievance Committee of the bar association which is certainly not his function," the Court of Appeals stated that "we would be loath in any event to mandate a procedure which would cast counsel in the role of prosecutor in a proceeding to determine how opposing counsel obtained his clients."

■ Under *Lefrak*, it was entirely proper for the magistrate to refuse to allow the discovery sought, since it was sought in support of a determination as to whether or not the various fee agreement provisions complained of violate the governing ethics laws. Since he had already concluded that there is "nothing in these provisions that taint[s] the trial process . . . as I understand that phrase," (Tr. 95.), the magistrate was under no obligation, and correctly eschewed, presiding over an ethics inquiry.

### III. Conclusion

For the foregoing reasons, this court adopts the magistrate's recommendation, and Defendants' motion seeking disqualification of Plaintiffs' counsel is DENIED. This court further concludes that the magistrate's orders denying Defendants' motions seeking discovery in connection with the disqualification motion were not clearly erroneous or contrary to law, and are therefore AFFIRMED.

It is SO ORDERED.